# EXHIBIT A

## EQUITY (MEMBERSHIP INTEREST) PURCHASE AGREEMENT

This EQUITY (MEMBERSHIP INTEREST) PURCHASE AGREEMENT ("this Agreement"), is dated effective as of January 1, 2023 (the "Effective Date"), and is made by and between **MICHAEL THOMAS and KATHLEEN SANDERS** (being collectively called the "Seller") and **XIINGO.COM, INC.** (being called the "Purchaser").

### RECITALS:

A.     FULL CIRCLE HOLDINGS, LLC, is a South Carolina limited liability company (the "Company") organized on October 31, 2019, which is owned equally by Michael Thomas and Kathleen Sanders.  The Company is the owner of (i) 51% of South Content, LLC, a South Carolina limited liability company; (ii) 76% of South Digital, LLC, a South Carolina limited liability company; (iii) 75% of Alison South Florida, LLC, a South Carolina limited liability; (iv) 75% of Alison South Chattanooga, LLC, a South Carolina limited liability company; and (v) 100% of Alison South Marketing Group, LLC  (collectively, the "LLC Subsidiaries"). The remaining ownership interests in the LLC Subsidiaries are owned by James Aycock (as to South Content, LLC), Jerry "Trey" Blanton (as to South Digital, LLC), Haley Weigle (as to Alison South Florida, LLC) and Amber Lehmann (as to Alison South Chattanooga, LLC), respectively.

B.     Purchaser desires to purchase the ownership interests of Seller in the Company and to after the time of purchase, convert the Company under South Carolina law to a corporation structure.

### TERMS OF AGREEMENT:

NOW, THEREFORE, FOR VALUE RECEIVED, the sufficiency of which is acknowledged by Seller and Purchaser, Seller and Purchaser hereby stipulate and agree as follows:

### ARTICLE I.

### DEFINITIONS

Section 1.1.  **Definitions.**  In addition to the terms defined elsewhere in this Agreement, the following terms have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Accounts Receivable" means the account receivables of the Company due from its Third-Party customers for goods and/or services provided by the Company as shown in its financial records as of Closing.

"Affiliate" means, with respect to a specified Person, any other Person or member of a group of Person acting together that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with the specified Person.  As used in this Agreement, the term "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Assets" means the property owned or used by the Company in the conduct of the Business and necessary to conduct the business of Company as presently conducted, other than the Excluded Assets.

1

"Balance Sheets" means the unaudited and compiled balance sheets of the Company and its subsidiaries as of the most recent fiscal year end.

"Balance Sheet Date" means the date of the Balance Sheet.

"Business Day" means any weekday on which nationally-chartered banks in South Carolina are open for business.

"Business Information" is defined in Section 5.4.

"Charter Documents" means (a) the certificate or articles of incorporation and the bylaws of a corporation, (b) the certificate of formation and partnership agreement of a partnership, (c) the certificate of formation and limited liability company agreement or operating agreement of a limited liability company and (d) the charter, formation and/or constitutional documents of any other legal entity, in each case including all amendments thereto.

"Claim" means any existing or threatened claim, demand, suit, action, investigation, proceeding or cause of action of any kind or character (in each case, whether civil, criminal, investigative or administrative, and whether made by a Governmental Authority or any other Person), known or unknown, absolute or contingent, asserted or unasserted, under any theory, including, without limitation, contract, tort, statutory liability, strict liability, employer liability, premises liability, products liability, breach of warranty or malpractice.

"Closing Date" is defined in Section 2.4.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any existing, executory contract of the Company with a Third Party, other than an Equipment Lease, Real Property Lease, a utility service contract or arrangement, or employment agreement or arrangement.

"Current Financial Statements" is defined in Section 3.5.

"Encumbrance" means any encumbrance, security interest, mortgage, deed of trust, lien, charge, pledge, option, right of first refusal or similar right, easement, restrictive covenant, Claim or restriction of any kind, including, without limitation, any restriction on the use, transfer, receipt of income or other exercise of any attributes of ownership.

"Environmental Law" means each present and future Law, Order or Permit pertaining to (a) public health or safety, (b) the protection, preservation or restoration of the environment or natural resources or (c) the generation, production, use, storage, transportation, processing, release or disposal of Hazardous Materials.

"GAAP" means generally accepted accounting principles in the United States as in effect on the date of this Agreement applied in a manner consistent with Sellers's historical financial statements.

"Governmental Authority" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether federal, state, local or foreign, or any agency, department or instrumentality thereof, or any court (public or private).

"Hazardous Material" means any substance, material, contaminant, pollutant or waste presently or hereafter listed, defined, designated or classified as hazardous, toxic, radioactive or dangerous under any Environmental Law or regulated as such by any Governmental Authority including, without limitation, any industrial substance, petroleum (or any derivative or by-product thereof), radon, radioactive material, asbestos (or asbestos containing material), urea formaldehyde, foam insulation, lead or polychlorinated biphenyls.

"Intellectual Property" means all United States and foreign intellectual and industrial property, including, without limitation, the Company logo, patent applications, patents and any reissues or reexaminations thereof, trademarks, service marks, trademark/service mark registrations and applications, brand names, trade names, all other names and slogans embodying business or product goodwill (or both), copyright registrations, mask works, copyrights, moral rights of authorship, rights in designs, trade secrets, technology, inventions, discoveries, improvements, know-how, proprietary rights, computer software and firmware, internet domain names, specifications, drawings, designs, formulae, processes, methods, technical information, confidential and proprietary information, and all other intellectual and industrial property rights, whether or not subject to statutory registration or protection.

"Key Customers" are the current Company customers identified on Schedule 3.10.

"Key Employees" are the current Company employees identified on Schedule 3.13.

"Law" means any applicable law, statute, code, ordinance, rule or regulation promulgated by any Governmental Authority, including any policy having the force and effect of law, any rule of common law and any judicial or administrative interpretation thereof.

"Leased Property" is defined in Section 3.8.

"Legal Proceeding" means any judicial, administrative, regulatory or arbitral proceeding, investigation or inquiry or administrative charge or complaint pending at law or in equity by or before any Governmental Authority.

"Liabilities" means all indebtedness or liabilities.

"Losses" means all Liabilities, losses, damages, injuries, harm, diminutions in value, costs (including, without limitation, costs of investigation), fines, fees and expenses (including reasonable attorneys' fees incident to any of the foregoing).

"Material Adverse Change" means a material adverse change in the properties, assets, condition (financial or otherwise), Business, operations or prospects of the Company, taken as a whole, or a material increase in the Company's liabilities, except trade obligations incurred in the Ordinary Course of Business.

"Material Adverse Effect" means, with respect to any Person, a material adverse effect on the properties, assets, condition (financial or otherwise), business, operations or prospects of such Person.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award by a Governmental Authority of competent jurisdiction.

"Ordinary Course of Business" means the usual and ordinary course of business for the Business, consistent with past practice.

3

"Permit" means any written approval, consent, exemption, franchise, license, permit, waiver, registration, filing, certificate or other authorization required by Law to conduct any portion of the Business as currently conducted, including without limitation all construction, installation and maintenance licenses and local health and fire permits pertaining to the physical facilities, manufacturing, equipment, staffing and records.

"Person" means any natural person, corporation, partnership, firm, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization, Governmental Authority or other legal entity.

"Purchaser Documents" shall mean this Agreement and each of the other agreements, certificates and instruments to be executed by Purchasers in connection with or pursuant to this Agreement.

"Seller Documents" shall mean this Agreement and each of the other agreements, certificates and instruments to be executed by Seller in connection with or pursuant to this Agreement.

"Taxes" (including, with correlative meaning, the term "Tax") means all taxes, charges, fees, levies, duties, penalties, assessments or other amounts imposed by or payable to any foreign, federal, state, local or other taxing authority or agency, including without limitation income, gross receipts, profits, windfall profits, gains, minimum, alternative minimum, estimated, ad valorem, value added, severance, stamp, customs, import, export, utility, use, service, excise, property, sales, transfer, franchise, payroll, withholding, social security, disability, employment, workers compensation, unemployment compensation and other taxes, and including any interest, penalties or additions attributable thereto.

"Tax Return" means any return, report, information return or other document (including any related or supporting information) required to be prepared with respect to Taxes.

"Third Party" means any Person other than Sellers, Purchaser or any of their respective Affiliates.

## ARTICLE II.

## PURCHASE AND SALE OF EQUITY INTERESTS

Section 2.1. **Purchase and Sale of the Equity Interests.** On the terms and subject to the conditions set forth in this Agreement, Seller will sell, assign, transfer, convey and deliver to Purchaser, and Purchaser will purchase, acquire and accept from Seller one hundred percent (100%) of the equity interests of the members in the Company, free of all liens and encumbrances. The Company equity interests to be sold are owned equally by Michael Thomas and Kathleen Sanders.

Section 2.2. **Conversion of Company at Closing.** Following Closing (hereinafter defined), the Company shall be converted under South Carolina and federal law to a c-corporation with four (4) classes of stock, being a class A common stock with full rights, with par value of $1.50, and total authorized shares of 10,000,000; a class B common stock with par value of 0.7% of class A, total authorized shares of 5,000,000, and without voting rights or board of directors seat; a class C common stock with par value at 0.4% of class A, total authorized shares of 5,000,000, and without voting rights or board of directors seat; and a class of preferred stock with rights which will be later determined.

Section 2.3. **Excluded Assets.** The sale of the Shares by Seller to Purchaser pursuant to this Agreement will not include cash or the other assets, rights and interests (collectively, the "Excluded Assets") which are identified in Schedule 2.3 attached hereto, and such Excluded Assets shall be distributed to the Seller on a pro rata basis, in proportion to their ownership of the Company.

Section 2.4. **Purchase Price.** In addition to the Post Closing Profit Sharing, the consideration (the "Purchase Price") to be paid by Purchaser to Seller as consideration for the purchase and sale of the Shares is $███████ in good funds, payable as follows: (a) $███████ cash at Closing; (b) $███████ cash on or before 45 days following Closing; (c) $███████ cash on or before 90 days following Closing but not later than March 31, 2023; and (d) $███████ payable in twelve (12) quarterly installments of principal plus interest at 4% interest per annum over thirty-six (36) total months from Closing, with the initial payment due July 1, 2023, such $███████ amount being represented by Purchaser's promissory note executed as of Closing. With regard to the $███████ sum payable to Seller, notwithstanding the scheduled amortization of payments payable to Seller, the quarterly installments shall be paid to Seller in an amount equal to fifty percent (50%) of the net profit for the quarter, but shall not exceed the payment as amortized (i.e., shall be capped at the amortized amount calculated over the 36-month period). For purposes hereof, the reference to "net profit" shall mean the Company profits derived after deduction of operating costs, interest and taxes from Company gross revenues. At the end of the 36 month period following Closing, all quarterly payments made by Purchaser during such 36 month period shall be totaled and that total balance shall be subtracted from the total scheduled quarterly amortization payments due to Seller, and any unpaid balance shall become immediately due and payable by Purchaser to Seller on the last day of the 36 month period. Additionally, the balance payable by Purchaser to Seller under the Promissory Note referenced in this section shall be secured by a Pledge Agreement of the interests acquired by Xiingo.com, Inc., such that the Pledge Agreement shall initially secure the portion of the stock that is equivalent to the amount due. By way of example, upon closing the Purchasers will still owe $███████ of the $███████ purchase price, so the Pledge Agreement will secure 66.67% of the Company's stock, but once the scheduled payment of $███████ has been made on March 31, 2023, the Purchaser's will have paid 50% of the purchase price so the Pledge Agreement will secure 50% of the Company's stock. The Pledge Agreement provided by Purchaser will include customary terms and provisions and will be signed by the parties at Closing, as well as the terms in Section (a) below.

    (a) Notwithstanding the above, the parties acknowledge that the Company's value may increase prior to full payment of the Note. In the event the Pledgor alleges an increase in the value of the Company leading to a disagreement between Pledgor and the Secured Parties as to the percentage of limited liability equity interests comprising the Collateral at a given time, which cannot be resolved within fourteen (14) days of the written notice from one party to the other of a dispute as to Collateral percentage, Pledgor shall propose the identity of three (3) potential professional business valuation appraisers to Secured Parties from which Secured Parties will select their choice of one (1) such professional business valuation appraiser to determine the extent of the Collateral coverage based on the value of the Collateral at that time. Within twenty-one (21) days of such selection, the parties will engage the choice made by Secured Parties, with Pledgor fully responsible for paying the proposed fee quoted by the selected professional business valuation appraiser. The Collateral value determination thereafter made by the selected and engaged professional business valuation appraiser shall be deemed to be binding upon the parties and each party agrees to reasonably cooperate with the value determination process.

Section 2.5. **Post-Closing Profit Sharing.** A post-closing profit sharing formula for Company principals shall be formulated within ninety (90) days of Closing. The individual employment contracts will be amended to that effect once the profit-sharing formula has been identified.

Section 2.6. **Closing.** Regardless of the date that all closing documents, schedules, and closing deliveries are actually signed and delivered, the closing of this transaction (the "Closing") shall be deemed to take place effective as of the 1st day of January, 2023, which is referred to as the "Closing Date." All proceedings to be taken and all documents to be executed and delivered by all parties at the Closing will be

deemed to have been taken, executed, and delivered simultaneously, and no proceedings will be deemed taken nor any documents executed or delivered until all have been taken, executed and delivered.  On the date determined in the "Escrow Instruction Agreement" (a document to be executed by the parties simultaneously with this Agreement that directs the parties on Closing details), Seller shall authorize the Purchaser's attorney to release the Seller Documents from escrow and deliver them to Purchaser, including the specific items set forth in <u>Section 6.5</u> herein, and Purchaser shall deliver to Seller the Purchaser Documents, including the specific items set forth in <u>Section 6.6</u> herein.

## ARTICLE III.

## REPRESENTATIONS AND WARRANTIES OF SELLER

As a material consideration for the payment by Purchaser of the Purchase Price, and except as disclosed to Purchaser in any Schedule hereto, each Seller represents and warrants to Purchaser the following as of the Closing Date:

Section 3.1.  **Organization.**  The Company is a domestic for-profit corporation, duly organized, validly existing and in good standing under the Laws of the State of South Carolina.  The Company has full power and authority to own, lease and operate its properties and to conduct the Business.

Section 3.2.  **Enforceability.**  Seller has full power and authority to execute and deliver the Seller Documents, to perform his or her respective obligations under the Seller Documents and to consummate the transactions contemplated by the Seller Documents.  The execution and delivery by Seller of the Seller Documents, the performance by each Seller of his or her respective obligations under the Seller Documents and the consummation by such Seller of the transactions contemplated by Seller Documents have been duly authorized.  This Agreement has been duly and validly executed and delivered by Sellers and constitutes the legal, valid and binding obligation of such Seller enforceable against such Seller in accordance with its terms.  As of the Closing, the Seller Documents other than this Agreement will be duly and validly executed and delivered by such Seller if a party thereto and, upon such execution and delivery, will constitute the legal, valid and binding obligations of such Seller enforceable in accordance with the respective terms.

Section 3.3.  **No Conflicts.**  The execution and delivery by such Seller of the Seller Documents, the performance by such Seller of its respective obligations under the Seller Documents and the consummation by such Seller of the transactions contemplated by Seller Documents do not, and will not:

(a)  violate any provision of Law or any Permit;

(b)  violate any provision of the Charter Documents of the Company;

(c)  require any consent, waiver, approval, registration, Order, action or authorization of, declaration or filing with or notification to any Governmental Authority or other Person (whether pursuant to a Contract or otherwise), other than a consent, waiver, approval, authorization, registration, Order, declaration, filing or notification that has been obtained or made prior to the execution and delivery by such Seller of this Agreement;

(d)  violate, conflict with, constitute a default under or breach any term, condition or provision of any Contract or Order (whether with the passage of time, the giving of notice or otherwise);

(e)　　result in the termination of, give rise to a right of termination or cancellation of or accelerate the performance required pursuant to any Contract (whether with the passage of time, the giving of notice or otherwise); or

(f)　　result in the creation of any Encumbrance with respect to any asset of the Company.

Section 3.4　**Capitalization.**　The aggregate number of shares and type of all authorized, issued and outstanding classes of capital stock, options and other securities of the Company (whether or not presently convertible into or exercisable or exchangeable for shares of capital stock of the Company) as of the date of this Agreement is set forth in <u>Schedule 3.4</u>.　All outstanding shares of capital stock are duly authorized, validly issued, fully paid and nonassessable and have been issued in compliance with all applicable securities laws.　The Company has not issued any other options, warrants, script rights to subscribe to, calls or commitments of any character whatsoever relating to, or securities, rights or obligations convertible into or exercisable or exchangeable for, or entered into any agreement giving any Person any right to subscribe for or acquire, any securities issued by the Company.

Section 3.5.　**Financial Statements.**　Purchaser has been provided the Balance Sheets, and the related unaudited and compiled statements of operations, cash flows and shareholders' equity for the period then ended (the "<u>Current Financial Statements</u>").　To such Seller's actual knowledge, the Current Financial Statements present fairly the material financial position of the Company and the material results of operations as of the dates and for the periods therein specified, and have been prepared in accordance with GAAP, consistently applied throughout the periods involved, subject, in the case of interim financial statements, to normal year-end adjustments in an amount and of a character not materially inconsistent with prior periods.　To such Seller's actual knowledge, the Current Financial Statements do not contain any items of a special or nonrecurring nature, except as expressly stated therein.　The Current Financial Statements have been prepared from the books and records of the Company, which, to such Seller's actual knowledge, accurately and fairly reflect the material consolidated financial condition and material results of operations of the Company as of the respective dates thereof and for the periods indicated.

Section 3.6.　**Undisclosed Liabilities.**　To such Seller's actual knowledge and except as disclosed in <u>Schedule 3.6</u>, the Company has no Liabilities, including any Claims against assets, other than (a) as set forth or reflected on the Balance Sheets and (b) current Liabilities incurred in the Ordinary Course of Business since the Balance Sheet Date.

Section 3.7.　**Absence of Certain Developments.**　To such Seller's actual knowledge, and except as described in <u>Schedule 3.7</u>, since the Balance Sheet Date, the Company has been operated in the Ordinary Course of Business, has incurred no Liabilities other than in the Ordinary Course of Business, and there has not been:

(a)　　any Material Adverse Change;

(b)　　any material change, not disclosed in the Current Financial Statements, in the accounting methods, practices or principles or cash management practices of Sellers;

(c)　　any material revaluation of any of the Company assets, including without limitation the write-down or write-off of notes, accounts receivable or inventory, other than in the Ordinary Course of Business;

(d)　　any sale, assignment, transfer, distribution, mortgage or pledge of any material part of the properties or assets of the Company, except sales of inventory in the Ordinary Course of

Business, or the placement of any Encumbrance on any material part of the properties or assets of the Company;

(e)     any material failure to use commercially reasonable efforts to preserve the Company as a going concern, to keep available to the Company the services of its key employees and to preserve for the Company the material goodwill of its suppliers, franchisees, Customers and others having business relations with it, consistent with the Ordinary Course of Business and the historical practice of the Company;

(f)     any material breach or default, acceleration, termination (or threatened termination), modification or cancellation of any Contract;

(g)     except in the Ordinary Course of Business, any (i) increase in the compensation payable or to become payable by the Company to any of its employees, including without limitation any bonuses other bonuses than those consistent with the Ordinary Course of Business and to be approved by Purchaser, which approval shall not be unreasonably withheld; (ii) adoption, amendment or increase in the coverage or benefits available under any Employee Benefit Plan or Benefit Arrangement or (iii) amendment or execution of any employment, deferred compensation, severance, consulting, non-competition, employee retention plan or similar agreement to which the Company is a party or involving an employee of the Company (other than employment terminable at will without penalty), except to the extent necessary to comply with any Law;

(h)     except in the Ordinary Course of Business, any termination of employment (whether voluntary or involuntary) of, or receipt or expectation of receipt of any resignation by, any key employee of the Company, or any termination of employment (whether voluntary or involuntary) of employees of the Company materially in excess of historical attrition in personnel;

(i)     any transaction between the Company and a related party, other than payment in the Ordinary Course of Business by the Company to any Affiliate of any Seller of office rentals or other amounts due under, or the amendment [subject to the consent of Purchaser, which shall not be unreasonably withheld] of, the leases for the Leased Property [as defined below] (the "Real Property Leases");

(j)     any cancellations or express waivers of any Claims or rights of the Company of material value;

(k)     any execution of capital leases by the Company;

(l)     any other transaction, agreement or commitment entered into materially affecting the Business or the assets of the Company that was not made in the Ordinary Course of Business; or

(m)     any agreement or understanding to do, or resulting in, any of the foregoing.

Section 3.8.  **Status of Company Assets.**

(a)     The Company has good and marketable title to all of the Assets, except for leased personal property and vehicles described in Schedule 3.8(a) (the "Leased Equipment") and the Leased Property, free and clear of all Encumbrances.

(b)     By acquiring the Shares as contemplated by this Agreement, Purchaser will be indirectly acquiring control, through the Company, of the Assets. No part of the Business and no Asset (other than the Leased Property defined below or the Leased Equipment) is owned or held by any Person other than the Company.

(c)     To such Seller's actual knowledge, each of the Equipment Leases is a valid and binding agreement of the Company and is in full force and effect and enforceable against each party thereto in accordance with its terms. To such Seller's actual knowledge, there has been no breach or default by any party (or event that with the passage of time, the giving of notice or both would constitute a breach or default) under any of the Equipment Leases. To such Seller's actual knowledge, the Company is in material, substantial compliance with each Equipment Lease and is not in receipt of any notice of termination or written claim of default under any such Equipment Lease.

(d)     The Company does not own, or have any interests in or rights with respect to, any real property; provided, however, that the Aiken, South Carolina office facility occupied by the Company is owned by Michael Thomas and Cynthia South, both of which are officers of the Company. The Company occupies its current facilities through lease arrangements (collectively, the "Leased Property"). The Company intends to retain, post-Closing, the leased office facilities located at 608 Broad St., Augusta, Georgia 30901 and at 132 Chesterfield St. South, Aiken, South Carolina 29801. With respect to each Leased Property:

(i)     Purchaser has been afforded a right to inspect and view the Leased Property. To Seller's knowledge, there are presently no pending or threatened condemnation actions or special assessments of any nature on the Leased Property or any part thereof. Such Seller has received no notice of any condemnation actions or special assessments being contemplated, and such Seller does not have any actual knowledge of any being contemplated. Such Seller has received no request, written or otherwise, from any Governmental Authority with regard to dedication of the Leased Property or any part thereof;

(ii)     Seller has received no notice of, and have no other actual knowledge of, any pending or contemplated material change in any regulation or private restriction applicable to the Leased Property or any part thereof, or of any pending or threatened judicial or administrative action by adjacent landowners or other Persons, materially and adversely affecting the Leased Property or any part thereof;

(iii)     to such Seller's actual knowledge, there is no Legal Proceeding pending or threatened against or relating to any portion of the Leased Property;

(iv)     to such Seller's actual knowledge, there are no attachments, executions or assignments for the benefit of creditors or voluntary or involuntary proceedings in bankruptcy or under any other debtor relief Laws contemplated by a pending or threatened action or suit materially affecting the Leased Property;

(v)     to Seller's actual knowledge, no Person has, or at the Closing Date shall have, any right or option to acquire all or any portion of the Leased Property; and

(vi)     to Seller's actual knowledge, no portion of the Leased Property shall be subject at the Closing Date to any agreement (written or oral), except the Lease applicable to such Leased Property, leases for Leased Equipment at such Leased Property, utility

service contracts, or to maintenance, landscaping, security system, or other Contracts identified on Schedule 3.8(d).

Section 3.9.  **Status of Company Contracts.**

(a)     To such Seller's actual knowledge, each of the Contracts is a valid and binding agreement of the Company and is in full force and effect and enforceable against each party thereto in accordance with its terms.  To such Seller's actual knowledge, there has been no breach or default by any party (or event that with the passage of time, the giving of notice or both would constitute a breach or default) under any of the Contracts.  To such Seller's actual knowledge, the Company is in material, substantial compliance with each Contract and is not in receipt of any notice of termination or written claim of default under any such Contract.  To such Seller's actual knowledge, no party to any Contract has threatened to, or notified the Company of any intention to, terminate or materially alter its relationship with the Company as a result of this Agreement or the consummation of the transactions contemplated hereby.  To such Seller's actual knowledge, no party to a Contract intends to alter its relationship with the Company as a result of, or in connection with, the transactions contemplated by this Agreement.

(b)     except as disclosed in Schedule 3.9 or as otherwise disclosed herein, the Company is not a party to, and no asset or property of the Company is bound by, any of the following types of contracts [as opposed to leases]:

(i)     contracts (including mortgages) pursuant to which any assets or properties of the Company are subject to any Encumbrance;

(ii)     contracts pursuant to which the Company is obligated to provide indemnification [as opposed to warranty or similar obligations] to any Third Party;

(iii)     contracts (including consent decrees) that impose (or could by their terms impose) any material restrictions on the Company with respect to its geographical area of operations or scope or type of business;

(iv)     contracts between the Company, on the one hand, and any related party, on the other hand (other than Contracts for employment or consulting services listed on Schedule 3.9); and

(v)     contracts not entered into in the Ordinary Course of Business.

Section 3.10.  **Status of Company Accounts Receivable and List of Key Customers.**

(a)     To such Seller's actual knowledge, all accounts receivable of Sellers are reflected in the Balance Sheet or arose in the Ordinary Course of Business since the Balance Sheet Date.  To such Seller's actual knowledge and belief, at least 95% of the Accounts Receivable) are and will be fully collectible in the Ordinary Course of Business and without recourse to any Legal Proceeding.  With regard to accounts receivable which pre-date the Closing, Seller shall assume responsibility for all efforts to collect the accounts receivable.

(b)     The customers of the Company listed on Schedule 3.10 attached hereto are deemed Key Customers.  Seller shall make reasonable efforts to maintain all such Key Customers subsequent to Closing.

Section 3.11. **Status of Company Intellectual Property.**

(a)  Extent of and Title to Intellectual Property.  To such Seller's actual knowledge, Schedule 3.11(a) contains a complete and correct list of all of the Intellectual Property that is or has been used, held for use or is reasonably necessary for use in the Business (the "Business Intellectual Property").  To such Seller's actual knowledge, the Company possesses and either owns, is licensed under or has the valid right to use all of the Business Intellectual Property.  To such Seller's actual knowledge, the Business Intellectual Property owned by the Company (the "Owned Intellectual Property") is not subject to any outstanding option, license or agreement of any kind, and is owned free and clear of all Encumbrances.  To such Seller's actual knowledge, all Business Intellectual Property licensed to the Company (the "Licensed Intellectual Property") has been licensed pursuant to agreements (the "Licenses") that are set forth on Schedule 3.11(a).  To such Seller's actual knowledge, all Business Intellectual Property that is neither Owned Intellectual Property nor Licensed Intellectual Property is in the public domain.

(b)  Registered Intellectual Property.  To such Seller's actual knowledge, Schedule 3.11(b) sets forth a correct and complete list of all of the following Business Intellectual Property as of the date of this Agreement, and indicates whether it is Owned Intellectual Property or Licensed Intellectual Property: (a) trademark and service mark registrations and applications for registration; (b) patents and pending patent applications; (c) copyright registrations and applications for registration and (d) trade names.

(c)  No Restrictions on Transfer.  To such Seller's actual knowledge, no Business Intellectual Property is subject to any outstanding Order, Contract or other Liability restricting in any material, adverse manner the use thereof by the Business or the transfer thereof by Sellers.

(d)  No Infringement by Third Parties.  To such Seller's actual knowledge, there is no unauthorized use, infringement or misappropriation of any Business Intellectual Property by any Person, including without limitation any current or former director, officer, employee, consultant or other agent of the Company.

(e)  No Infringement by the Business.  To such Seller's actual knowledge, no Person has asserted, or threatened to assert, any Claim with respect to the Business Intellectual Property, including any claim of ownership of or infringement by the Business Intellectual Property.  To such Seller's actual knowledge, there is no reasonable basis for any bona fide Claim (i) to the effect that the Business as presently conducted infringes, violates or misappropriates any Intellectual Property of any other Person; or (ii) challenging the ownership, validity, enforceability or effectiveness of any of the Business Intellectual Property or any license.

(f)  No Competitive Intellectual Property.  To such Seller's actual knowledge, no director, officer, employee, consultant or other agent of the Company owns any rights in Intellectual Property that are directly competitive with those now owned or used by the Company or derived from or in connection with the conduct of the Company's business.

Section 3.12.  **Insurance/Seller Assumption of Prior Liabilities Not Covered By Insurance.** Insurance coverages for the Company are in place as reflected on Schedule 3.12, and will remain in place through the Closing Date, except for any renewal or substitution thereof in the Ordinary Course of Business. Sellers acknowledge that they have not acquired for the Company, or its operating officers or personnel, errors and omissions-type insurance or any other type of liability insurance, but that such insurance is intended to be secured by Company after the closing.  Seller agrees to assume all defense and liability costs

11

associated with liabilities or alleged liabilities pertaining to factual events which pre-date the Closing of this purchase which are not covered by existing insurance.

Section 3.13.  **Employees.**

(a)     To such Seller's actual knowledge, <u>Schedule 3.13</u> lists the name and address of each officer and employee of the Company and each consultant to the Company, whether or not such Person's employment is terminable at will, such Person's date of employment, current job title or relationship to the Company, the aggregate annual cash compensation paid to such Person by the Company, a description of all bonus or benefit plans applicable to such Person, and the date and amount of their last increase in compensation. Those employees who are designated as Key Employees are identified on such Schedule 3.13. Seller shall make reasonable efforts to maintain each such Key Employee subsequent to Closing.

(b)     To such Seller's actual knowledge, the Company is not a party to any labor, union or collective bargaining agreement and there are no labor, union or collective bargaining agreements that pertain to any employee of the Company. To such Seller's actual knowledge, there is no organizing activity (including any demand for recognition or certification proceeding pending with the National Labor Relations Board) involving any employees of the Company by any labor organization or group of employees presently pending or threatened. To such Seller's actual knowledge, no strike, work stoppage, lockout, labor grievance or other labor dispute is presently pending or threatened against the Company, and no such strike, work stoppage, lockout, labor grievance or other labor dispute has occurred since January 1, 2020.

(c)     To such Seller's actual knowledge, the Company is currently in substantial compliance, in material respect, with all material Laws relating to the employment of labor, including without limitation the Occupational Safety and Health Act, other than minor violations of Law that are typical in the Ordinary Course of Business and the ordinary course of business for similar companies.

(d)     Except as set for in Schedule 3.13 (d), to such Seller's actual knowledge, the Company does not have any oral or written agreements or understandings to provide its employees pay raises, bonuses, stock options or other compensation benefits.

(e)     Except as set for in Schedule 3.13 (e), to such Seller's actual knowledge, the Company does not have any written employment agreements with its employees.

Section 3.14.  **Employee Benefits.**

(a)     To such Seller's actual knowledge, there are no material, written "employee benefit plans," as defined in Section 3(3) of ERISA, maintained by the Company or to which Sellers contributed or is obligated to contribute for current or former employees ("<u>Employee Benefit Plans</u>"). To such Seller's actual knowledge, except for the health benefit plan of the Company and any requirements under Law, there are no contracts with any of its employees providing for employment or severance, or plan or arrangement with any of its employees providing for insurance coverage, severance, termination or similar coverage. To such Seller's actual knowledge, any written compensation policies and practices maintained by the Company covering any employee or former employee that is not an Employee Benefit Plan (a "<u>Benefit Arrangement</u>") is listed on <u>Schedule 3.14</u>, and true, correct and complete copies thereof have been made available or delivered to Purchaser by the Company.

(b)     Except as set forth in Schedule 3.14(b), to such Seller's actual knowledge, except to the extent provided in any Section 401(k) plan of the Company, the Company does not maintain and has no obligation to contribute to (or any other liability with respect to) any funded or unfunded Employee Benefit Plan that provides post-retirement health, accident or life insurance benefits to current or former employees, current or former independent contractors, current or future retirees, their spouses, dependents or beneficiaries, other than limited health benefits required to be provided to former employees, their spouses and other dependents under Internal Revenue Code Section 4980B.

(c)     To such Seller's actual knowledge, except with regard to any Section 401(k) plan of the Company, there are no employee pension plans (as defined in Section 3(2) of ERISA) of the Company (the "Employee Pension Plans").

Section 3.15.  **Compliance with Law.**  To such Seller's actual knowledge, except as disclosed on Schedule 3.15, the Company is in substantial compliance, in material respects, with all material Laws relating to the conduct of the Business, including without limitation all Laws relating to occupational health and safety, product quality, safety and employment and labor matters, other than minor violations of Law that are typical in the Ordinary Course of Business and in the ordinary course of business for similar companies.

Section 3.16.  **Permits.**  To such Seller's actual knowledge, except as disclosed on Schedule 3.16, the Company has all Permits necessary for the conduct of the  Business as currently conducted, all such Permits are in full force and effect, the Company is in substantial compliance with the material requirements of all such Permits, and no loss or expiration of any Permit is pending, threatened or reasonably foreseeable, other than expiration of Permits that may be renewed in the Ordinary Course of Business without lapsing.

Section 3.17.  **Environmental Matters.**

(a)     Legal Compliance.  To such Seller's actual knowledge, except as disclosed on Schedule 3.17, the Business is in substantial compliance, in material respects, with all material Environmental Laws, other than minor violations of Law that are typical in the Ordinary Course of Business and in the ordinary course of business for similar companies.

(b)     Absence of Certain Hazardous Materials.  To such Seller's actual knowledge, except as disclosed on Schedule 3.17 or in any environmental audit or study provided to Purchaser, or for Hazardous Materials being stored, handled, or disposed of in compliance with Environmental Laws, none of the Leased Properties contains any in-ground Hazardous Materials in amounts exceeding the levels permitted by Environmental Laws.

(c)     No Claims or Proceedings.  To such Seller's actual knowledge, except as disclosed on Schedule 3.17, the Company is not subject to any pending Claim or Legal Proceeding investigating, asserting or alleging the material violation of any Environmental Law,  neither the Company, nor any material part of the Assets, are subject to any material Liability relating to any Claim or Legal Proceeding, any settlement thereof or any Order asserted, arising under or relating to any Environmental Law, and there are no material environmental conditions regarding the a material part of the Business or the Assets that could reasonably be anticipated to (i) form the basis of any material, valid Claim against a material part of the Assets or the Company, or (ii) cause a material part of the Business or the Assets to be subject to any material restriction on ownership, occupancy, use or transfer under any Environmental Law.

(d)     No Notices or Threats of Liability.  To such Seller's actual knowledge, except as disclosed on Schedule 3.17, the Company has not received any notice, demand letter or request for information from any Governmental Authority or other Person [not previously resolved or handled] indicating, asserting or alleging that the Company is or may now be in material violation of any material Environmental Law, may be materially liable under any material Environmental Law, or may be a potentially responsible party in a material respect at any Superfund site, and no Governmental Authority or other Person has threatened to initiate any material Claim, Legal Proceeding or investigation [not previously resolved or handled] after the date of this Agreement relating to the material violation or possible material violation of any material Environmental Law by the Company.

(e)     Environmental Reports.  To such Seller's actual knowledge, except as disclosed on Schedule 3.17(e) or ones previously handled or resolved, no reports have been filed, or are required to be filed, by the Company relating to any material part of the Business or any Assets, concerning the material release of any Hazardous Material or the threatened or actual material violation of any material Environmental Law.  To such Seller's actual knowledge, all existing, tangible, and material environmental investigations, studies, audits, tests, reviews and other analyses regarding material compliance or noncompliance with any material Environmental Law by the Company, the Business or the Leased Property that have not been previously handled or resolved, have been, or will soon be, made available or delivered to Purchasers.

Section 3.18.  **Legal Proceedings.**  To such Seller's actual knowledge, except as disclosed on Schedule 3.18, there are no Legal Proceedings, pending or threatened, that affect the validity of this Agreement or any material action taken or to be taken by the Company or Sellers in connection with the consummation of the transactions contemplated by this Agreement, and no material part of the Assets are subject to or bound by any Order against the Company currently in effect.

Section 3.19.  **Taxes.**

(a)     To such Seller's actual knowledge, and except as disclosed on Schedule 3.19, the Company has filed (or there has been filed on its behalf) with the appropriate taxing authorities all Tax Returns required to be filed by it and paid (or there has been paid on its behalf) all Taxes due or claimed to be due from it by any taxing authority, and there are no liens for Taxes upon the assets or properties of the Company except for statutory liens for current Taxes not yet due.

(b)     To such Seller's actual knowledge, and except as disclosed on Schedule 3.19, all Tax Returns previously prepared are correct and complete in all material respects.

(c)     To such Seller's actual knowledge, and except as disclosed on Schedule 3.19, the Company is in substantial compliance, in material respects, with all applicable material Laws, rules and regulations relating to the payment and withholding of Taxes (including, without limitation, withholding of Taxes pursuant to Sections 1441 and 1442 of the Code or similar provisions under any foreign Laws) and has withheld and paid over to the proper Governmental Authorities all amounts required to be withheld and paid over under all applicable material Laws.

(d)     To such Seller's actual knowledge, and except as disclosed on Schedule 3.19, no federal, state, local or foreign audits or other administrative proceedings or court proceedings (the "Audits") exist with regard to any Taxes or Tax Returns of the Company, and the Company has not received any notice that such an Audit is pending or threatened with respect to any Taxes due from, or with respect to, the Company or any Tax Return filed by or with respect to the Company.

Section 3.20. **Existing Related Party Transactions.** There are, to Purchaser's best knowledge, inter-company receivables and/or payables between the Company, on the one hand, and Related Parties, on the other hand. There are also, to Purchaser's best knowledge, outstanding profit sharing proceeds recorded for affiliated companies.   All such intercompany receivables and payables and all such recorded, but undelivered, profit sharing proceeds shall be resolved by Seller at or prior to Closing.

Section 3.21. **Foreign Registrations/Assumed Names.** To such Seller's actual knowledge, Schedule 3.21 sets forth a list of each of the jurisdictions in which the Company is duly registered and authorized to conduct its business and/or has registered any assumed names.

Section 3.22. **Subsidiaries and Investments.** To such Seller's actual knowledge, the Company does not own, directly or indirectly, any stock, partnership interest or joint venture interest in, or any security or debt or equity interest issued by, any Person, or any option or right to acquire any of the foregoing in any entity other than the LLC Subsidiaries.

Section 3.23. **Brokers' Fees.** To such Seller's actual knowledge, the Company has no liability or obligation to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement other than the brokerage of We Are Barney. Other than We Are Barney, Seller has no liability or obligation to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement.

Section 3.24. **Errors and Omissions Liability for Pre-Closing Occurrences.** Purchaser shall not be responsible for any errors and omissions liabilities which may arise after Closing which relate to claims which exist prior to Closing or which relate solely to actions, occurrences and/or omissions which occur prior to Closing. All such liabilities, if any, shall remain the sole responsibility of Seller. Seller shall not be responsible for any errors and omissions liabilities which relate to claims arising after Closing or which relate solely to actions, occurrences and/or omissions which occur after Closing. All such liabilities, if any, shall remain the sole responsibility of Purchaser.

Section 3.25. **No Misrepresentations.** To such Seller's actual knowledge, the representations, warranties and statements made by Sellers in or pursuant to this Agreement are true, complete and correct in all material respects and do not contain any untrue statement of a material fact or omit to state any material fact necessary to make any such representation, warranty or statement, under the circumstances in which it is made, not misleading.

**ARTICLE IV.**

**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Section 4.1. **Enforceability.** Purchaser has full power and authority to execute and deliver this Agreement and each of the other agreements, certificates and instruments to be executed by Purchaser in connection with or pursuant to this Agreement (collectively, and together with this Agreement, the "Purchaser Documents"), to perform their obligations under Purchaser Documents and to consummate the transactions contemplated by this Agreement.  The execution and delivery by Purchaser of Purchaser Documents, the performance by Purchaser of its obligations under Purchaser Documents and the consummation by Purchaser of the transactions contemplated by Purchaser Documents have been duly authorized by all necessary action. This Agreement has been duly and validly executed and delivered by Purchaser and constitutes the legal, valid and binding obligation of Purchaser enforceable against Purchaser in accordance with its terms.  As of the Closing, the other Purchaser Documents will be duly and validly executed and delivered by Purchaser and, upon such execution and delivery, will constitute the legal, valid

and binding obligations of Purchaser enforceable against Purchaser in accordance with their respective terms.

Section 4.2. **No Conflicts.** The execution and delivery by Purchaser of Purchaser Documents, the performance by Purchaser of their obligations under Purchaser Documents and the consummation by Purchaser of the transactions contemplated by Purchaser Documents do not, and will not, (a) violate any provision of Law, (b) require any consent, waiver, approval, Order, registration, action, or authorization of, declaration or filing with or notification to any Governmental Authority or other Person (whether pursuant to a contract or otherwise), other than a consent, waiver, approval, Order, registration, authorization, declaration, filing or notification that has been obtained or made prior to the execution and delivery by Purchaser of this Agreement; or (c) violate, conflict with, constitute a default under or breach any term, condition or provision of any contract or Order (whether with the passage of time, the giving of notice or otherwise).

Section 4.3. **Legal Proceedings.** There are no Legal Proceedings, pending or threatened, that question the validity of this Agreement or any action taken or to be taken by Purchaser in connection with the consummation of the transactions contemplated by this Agreement.

## ARTICLE V.

## COVENANTS APPLICABLE TO PERIOD PRIOR TO CLOSING

Section 5.1. **Conduct of the Business Pending the Closing.** Except as otherwise expressly contemplated by this Agreement, from the date hereof until the Closing Date, Sellers and/or the Company will not, without prior written consent from Purchaser:

(a)     effect any material transaction involving the Company, which is materially inconsistent with the past practices of the Company or not in material furtherance of the Business;

(b)     materially increase the salary or benefits of any employee of the Company or pay any property to any Person, including employees and shareholders, which is materially inconsistent with the past practices of the Company;

(c)     make any material capital expenditures or commitments not reasonably necessary for the continued operations of the Company in the Ordinary Course of Business that have not been approved by the directors of the Company prior to the date of this Agreement, or committed to, or contracted for, prior to the date hereof; or

(d)     sell, assign, transfer, factor or convey any material portion of the Assets materially inconsistent with the Ordinary Course of Business or past practices of the Company.

Section 5.2. **Acquisition Proposals.** Seller and the Company will not, directly or indirectly, initiate, solicit or encourage any third party to make, or facilitate (including by the provision of information regarding the Company), entertain, discuss or negotiate, or endorse, accept or enter into any agreement with respect to, any proposal for an acquisition. Seller will promptly notify Purchaser of the existence of any inquiry or proposal received by them or any related Person, or any of their agents or representatives relating to an acquisition.

Section 5.3. **Access to Information.**

16

(a)      Prior to the Closing Date, Purchaser will be entitled, through its authorized officers, employees and representatives (including, without limitation, its legal counsel, accountants, investment bankers and other representatives) (collectively, the "Purchaser Representatives"), to: (a) have reasonable access to Company's directors, officers, employees, agents, assets and properties, as well as all relevant books, records and documents of or relating to the Business, (b) such information, financial records and other documents relating to the Company as any Purchaser Representative may reasonably request, (c) make extracts and copies of any such books, records, documents and information and (d) have reasonable access to the Company's accountants, auditors, customers and suppliers for consultation or verification of any information.  Purchaser's investigation and examination will be conducted during regular business hours, under reasonable circumstances and upon reasonable prior notice to the Company.  Purchaser will not contact, directly or indirectly, any employee, customer or vendor of the Company to discuss the transactions contemplated by this Agreement, or any other subject related thereto, without the prior written consent of the Company, which consent will not be unreasonably withheld, delayed or conditioned.  At a time (within the thirty (30) days immediately preceding the Closing) and place mutually agreeable to Purchasers and Sellers, the Company will arrange for face-to-face meetings between Purchaser and senior employees of the Company, and for group meetings between Purchaser and other employees of the Company, for the purpose of introducing such employees to Purchasers.  Seller will use commercially reasonable efforts to cause all such Persons to cooperate with Purchaser Representative(s) in such an investigation and examination.  Prior to Closing, and at all times in the future if Closing does not take place, Purchaser will and will cause the Purchaser Representatives to: (a) maintain the confidentiality of the Business Information (as defined below), including without limitation any information or materials provided or acquired by Purchasers or any Purchaser Representative as part of due diligence or any such investigation, (b) not, directly or indirectly, (i) transfer or disclose any such Business Information to any Third Party; (ii) use any such Business Information; or (iii) take any other action with respect to such Business Information that is inconsistent with the confidential and proprietary nature thereof.

(b)      For a period of up to three (3) years after the Closing Date, Seller shall have a right of access during business hours to historical files and computer records relating to the Business as reasonably necessary, in Sellers' opinion, to properly prepare or defend tax returns (including employment tax returns), prepare for or defend a tax audit, defend or support worker's compensation insurance ratings or estimates and to provide support for accounts receivable collection efforts.  Purchaser agrees to provide written notice to Sellers of the location of the historical files and computerized records of the Company.  During the three (3) year access period, historical files and computerized records of the Company shall not be destroyed by Purchaser without first offering same to Sellers.

Section 5.4.  **Confidentiality.**    From and after the Closing, Seller will, (a) maintain the confidentiality of the Business Information (as defined below), (b) not, directly or indirectly, (i) transfer or disclose any Business Information to any Third Party; (ii) use any Business Information; or (iii) take any other action with respect to the Business Information that is inconsistent with the confidential and proprietary nature thereof.  "Business Information" means all information and materials relating to the Company or the Business, whether in oral, written, graphic or machine-readable form, that is proprietary in nature, including without limitation all specifications, user, operations or systems manuals, diagrams, graphs, models, sketches, technical data, research, business or financial information, plans, strategies, forecasts, forecast assumptions, business practices, marketing information and material, customer names, proprietary ideas, concepts, know-how, methodologies and all other information related to the Company or the Business; provided, however, that "Business Information" will not include any of the foregoing that is then in the public domain through no fault of the Sellers.

Section 5.5.  **Public Announcements.**  None of the Company, Seller, Purchaser or their respective related Persons, agents and representatives will issue any press release or public announcement concerning this Agreement or the transactions contemplated by this Agreement without obtaining the prior written

17

approval of the other parties to this Agreement; provided, however, that Purchaser has authorized Seller to cause the Company to notify the Company's employees of the transactions contemplated hereby as well as to make a public announcement to the extent that this transaction will create a strategic partnership to offer more products and services to the public.

Section 5.6. **Supplemental Disclosure.** Seller will promptly supplement or amend any disclosures made pursuant to this Agreement with respect to any matter of which they acquire actual knowledge, and that arises or is discovered, after the date hereof and prior to the Closing Date.

## ARTICLE VI.

## CONDITIONS PRECEDENT TO SELLER'S AND PURCHASER'S OBLIGATIONS/CLOSING DELIVERIES AND STIPULATIONS

Section 6.1. **Conditions to Obligations of Sellers and Purchasers to Close Transaction.** The obligations of Purchaser to consummate the purchase of the Shares on the Closing Date, as well as the obligations of Seller to consummate the sale, transfer and assignment to Purchaser of the Shares on the Closing Date is subject to the satisfaction of the following conditions (any or all of which may be waived by Purchaser or Seller, respectively, at or prior to the Closing):

(a)     All representations and warranties of Purchaser and Seller contained in this Agreement must be true and correct in all material respects at and as of the Closing Date and Purchaser and Seller must have performed and complied, in all material respects, with all obligations and covenants required by this Agreement to be performed or complied with by them on or prior to the Closing Date

(b)     All material consents, approvals, Orders or authorizations of Governmental Authorities and other Persons (whether pursuant to Permits, Contracts or otherwise) reasonably necessary for the consummation of the transactions contemplated by this Agreement must have been obtained and all notices to Governmental Authorities and other Persons (whether pursuant to Permits, Contracts or otherwise) reasonably necessary for the consummation of the transactions contemplated by this Agreement must have been given;

(c)     there shall not be pending any injunctions or other litigation that materially and adversely affect this transaction, the Company, Purchaser or Seller; and

(d)     there shall not have occurred any Material Adverse Change to the Company's assets, liabilities, financial condition, operating results, customer relations, employee relations, business prospects, cash flow or net worth prior to the Closing Date.

(e)     The distribution to the Seller of the Excluded Assets.

Section 6.2. **Post-Closing Non-Competition Agreements from Engaged Officers**. Each of employees Thomas, Sanders and South agree, for a period of years stated in their respective Employment Agreements, from and after the Closing Date, not to compete with the Company in South Carolina nor in any other state where Company maintains an existing office, not to solicit for employment the Company's employees, and not to disparage the Company or Purchaser.

Section 6.3. **Post-Closing Employment of Thomas, Sanders and South**. Purchaser shall cause the Company, post-Closing, to employ Thomas as CEO for a three (3) year period commencing upon the Closing Date at an annual salary of $140,000, payable bi-monthly in arrears on the historical and customary

payroll dates utilized by the Company. Purchaser shall cause the Company, post-Closing, to employ Sanders as Chief Marketing Officer for a one (1) year period commencing upon the Closing Date at an annual salary of $██████, payable bi-monthly in arrears on the historical and customary payroll dates utilized by the Company. Purchaser shall cause the Company, post-Closing, to employ South as Director of Communications for a two (2) year period commencing upon the Closing Date at an annual salary of $████, payable bi-monthly in arrears on the historical and customary payroll dates utilized by the Company. At Closing, Thomas, Sanders and South shall execute the forms of Employment Agreement attached hereto and made a part hereof as Exhibits "C-1" through "C-3".

Section 6.5. **Seller's Closing Deliveries.** At the Closing, Seller shall deliver (or cause to be delivered) to Purchaser each of the following:

(a) the original certificates representing the Shares together with a duly executed Stock Power executed by each Seller in the form attached hereto and made a part hereof as Exhibit "D";

(b) the written resignations of any person serving as an officer or director of the Company;

(c) executed originals of the Non-Competition and Non-Solicitation Agreement and the Employment Agreements;

(d) a certificate (dated the Closing Date and in form and substance reasonably satisfactory to Purchaser), executed on behalf of Seller certifying as to the fulfillment of the conditions set forth in Section 6.1; and

(e) actual or constructive delivery of all keys, codes, files and Business Information.

Section 6.6. **Purchaser's Closing Deliveries.** At Closing, Purchaser shall deliver (or cause to be delivered) to Seller each of the following:

(a) the cash portion of the Purchase Price in good funds;

(b) an executed promissory note for the deferred portion of the Purchase Price;

(c) the Non-Competition and Non-Solicitation Agreements and the Employment Agreements;

(d) a certificate (dated the Closing Date and in form and substance reasonably satisfactory to Seller), executed by Purchaser, certifying as to the fulfillment of the conditions set forth in Section 6.1.; and

(e) evidence of health insurance coverage for employees retained by the Company which is at least substantially equivalent to the price and quality of health insurance coverage provided generally by the Company to its employees during the term of Sellers' ownership.

## ARTICLE VII.

## TERMINATION

Section 7.1. **Termination.** This Agreement may be terminated prior to or in the absence of the Closing as follows:

(a)      by the written agreement of Purchaser and Seller, upon which event, the Earnest Money shall be returned to Purchaser;

(b)      by either Purchaser or Seller if a final nonappealable Order is in effect restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement, upon which event, the Earnest Money shall be returned to Purchaser;

(c)      by Purchaser, if Seller materially breaches any representation, warranty, covenant or agreement set forth in this Agreement or in any instrument executed in connection with the transactions contemplated by this Agreement that would be reasonably likely to prevent the Closing from occurring in accordance with this Agreement on or before the Closing Deadline, upon which event, the Earnest Money shall be returned to Purchaser;

(d)      by Purchaser, if closing does not occur by the Closing Date, unless the failure of such occurrence is due to the failure of Purchaser to perform or observe its agreements as set forth in this Agreement required to be performed or observed on or before the Closing Date;

(e)      by Seller, if Purchaser materially breaches any representation, warranty, covenant or agreement set forth in this Agreement or in any instrument executed in connection with the transactions contemplated by this Agreement that would be reasonably likely to prevent the Closing from occurring in accordance with this Agreement on or before the Closing Deadline;

(f)      by Seller, if Closing does not occur by the Closing Date, unless the failure of such occurrence is due to the failure of Seller to perform or observe their agreements as set forth in this Agreement required to be performed or observed on or before the Closing Date; and

(g)      by Purchaser, pursuant to Section 7.3, upon which event, the Earnest Money shall be returned to Purchaser;

Section 7.2.  **Effect of Termination.**  If this Agreement is terminated in accordance with Section 7.1, and the transactions contemplated by this Agreement are not consummated, this Agreement will become null and void and of no further force and effect, except (a) for this Section 7.2, (b) for the provisions of Section 5.4, and Section 7.4 and (c) that the termination of this Agreement for any cause will not relieve any party to this Agreement from any liability that at the time of termination had already accrued to any other party to this Agreement or that thereafter may accrue in respect of any act or omission of such party prior to such termination.

Section 7.3.  **Special Purchaser Termination Rights.**  Purchaser may terminate this Agreement at any time prior to Closing without any liability accruing for such termination ("Termination for Cause"): (i) upon the filing or threat of filing of a Legal Proceeding against Seller or the Company materially and substantially relating to the transactions contemplated by this Agreement, (ii) if a substantial casualty occurs with respect to any material assets of the Company, (iii) if material, substantial negative publicity occurs with respect to the Business, (iv) the Company is found by a Governmental Authority to have violated any material term of a Permit, (v) if any Governmental Authority initiates an investigation or Legal Proceeding against Seller or the Company, (vi) if there is any material inaccuracy in the Current Financial Statements, the financial information provided during due diligence or other material business records of Sellers or the Business, (vii) if the execution of this Agreement results in the loss of a key customer or customers representing ten percent (10%) or more of the Company's business revenues, or (viii) if the execution of this Agreement results in the loss of key employees anticipated by Purchaser to be retained subsequent to Closing.  Termination by Purchaser pursuant to this Section shall obligate Escrow Agent to return to Purchaser the Earnest Money.

Section 7.4.  **Return of Confidential Information.**  If this Agreement is terminated in accordance with Section 7.1, and the transactions contemplated by this Agreement are not consummated, (a) Purchaser will (and will cause each of its related Persons, agents and representatives to) return to Seller or destroy all confidential or proprietary information of Seller or the Company in its possession and certify such return or destruction to Seller and (b) Seller will (and will cause each of its related Persons, agents and representatives to) return to Purchaser or destroy all confidential or proprietary information of Purchaser in their possession and certify such return or destruction to Purchaser.

# ARTICLE VIII.

## INDEMNIFICATION

Section 8.1.  **Indemnification by Seller.**  Subject to the other provisions of this Article VIII, including without limitation Section 8.3, Seller agrees to defend, indemnify and hold Purchaser and its successors and assigns (the "Indemnitees") harmless from and against any and all Claims and Losses suffered by any Indemnitee directly arising from or relating to:

       (a)     any facts that constitute, or any allegations that, if true, would constitute, a material breach of any representation or warranty made by such Seller in this Agreement;

       (b)     any facts that constitute, or any allegations that, if true, would constitute, a material breach or default in the performance of any covenant, obligation or agreement of such Seller pursuant to this Agreement; and

       (c)     actions or non-actions by Company or its principals, officers or employees which occurred prior to the date of Closing.

Section 8.2.  **Limitations.**  Notwithstanding anything herein to the contrary, all obligations of Seller to indemnify any Indemnitees shall be subject to: (a) "basket" and "deductible", and therefore shall not apply, unless and until the applicable Losses to which such indemnification obligations apply, and for which any Indemnitee is not covered under any insurance policy, exceeds $100,000.00; and (b) a maximum limit, with respect to each Seller, equal to its allocation of the Purchase Price in Section 2.3 above.

Section 8.3.  **Survival of Representations and Warranties.**  The representations and warranties of Seller (or any of them) set forth in this Agreement will survive the execution and delivery of this Agreement and the Closing until the one (1) year anniversary of the Closing, except that any representation or warranty the violation of which is made the basis of a Claim for indemnification pursuant to this Article VIII will survive until such Claim is finally resolved if Purchaser notifies Seller of such Claim in reasonable detail prior to the date on which such representation or warranty would otherwise expire hereunder.  No claim for indemnification pursuant to Section 8.1(a) based on the breach or alleged breach of a representation or warranty may be asserted by Purchaser after the date on which such representation or warranty expires.

Section 8.4.  **Notice and Resolution of Claims.**

(a) Notice.  Each Indemnitee must provide written notice within five (5) business days to Seller (the "Indemnifying Party") after obtaining knowledge of any claim that it may have pursuant to Section 8.1 (whether for its own Losses or in connection with a Third Party Claim); provided that the failure to provide reasonably prompt notice will not limit the rights of an Indemnitee to indemnification hereunder except to the extent that such failure materially increases the dollar amount of any such claim for indemnification or

materially prejudices the ability of the Indemnifying Party to defend such claim.  Such notice will set forth in reasonable detail the claim and the basis for indemnification.

(b) <u>Right to Assume Defense</u>.  With respect to a claim for indemnity that arises from a Third Party Claim, the Indemnifying Party will have sixty (60) days after receipt of notice to assume the conduct and control of the settlement or defense of such Third Party Claim, through counsel selected by the Indemnifying Party, though reasonably acceptable to the Indemnitee, and at the expense of the Indemnifying Party, if the Indemnifying Party acknowledges its obligation to indemnify the Indemnitee for any Losses resulting from such Third Party Claim.  The Indemnitee may participate in such defense or settlement through its own counsel, but such separate counsel will be at its own expense unless the conditions set forth above are not satisfied.  In no event, however, will the Indemnifying Party be liable for the fees and expenses of more than one separate counsel of the Indemnitee.

(c) <u>Obligations Following Assumption of Defense</u>.  If the Indemnifying Party assumes the defense of a Third-Party Claim, they must take all commercially reasonable steps necessary to investigate and defend or settle such Third-Party Claim and will hold the Indemnitee harmless from and against any and all Losses caused by or arising out of any settlement approved by the Indemnifying Parties or any judgment entered in connection with such Third-Party Claim.  Without the written consent of the Indemnitee, not to be unreasonably withheld or delayed, the Indemnifying Party will not consent to entry of any judgment or enter into any settlement that does not include an unconditional and complete release of the Indemnitee by the claimant or plaintiff making the Third-Party Claim.

(d) <u>Failure to Assume Defense</u>.  Failure by the Indemnifying Party to notify the Indemnitee of its election to assume the defense of any Third-Party Claim within sixty (60) days after their receipt of notice thereof pursuant to <u>Section 8.4(a)</u> will be deemed a waiver by the Indemnifying Party of its right to assume the defense of such Third-Party Claim.  In such event, the Indemnitee shall defend against such Third-Party Claim in any manner it in good faith deems reasonably appropriate.  The Indemnitee may settle such Third-Party Claim or consent to the entry of any judgment with respect thereto, provided that it acts in good faith and in a commercially reasonable manner.

(e) <u>Payment of Indemnity</u>.  Upon final agreement by the parties or the entry of a final, non-appealable order by a court of competent jurisdiction that an Indemnitee is entitled to indemnification under this <u>Article VIII</u>, the Indemnifying Party must promptly pay or reimburse, as appropriate, the Indemnitee for all Losses to which it is entitled to be indemnified hereunder.

## ARTICLE IX.

## TAX MATTERS

Section 9.1.  **Cooperation for Certain Tax-Related Matters.**  Purchaser and Seller will, and will cause their respective representatives and agents to, provide any requesting party that is a party to this Agreement with such assistance and documents, without charge, as may be reasonably requested by such party in connection with (a) the preparation of any Tax Return of or relating to Seller, (b) the conduct of any audit relating to Liability for or refunds or adjustments with respect to Taxes and (c) any other Tax-related matter that is a subject of this Agreement.  Such cooperation and assistance will be provided to the requesting party promptly upon its request.  This covenant shall survive the Closing.

## ARTICLE X.

## MISCELLANEOUS

Section 10.1. **Headings.**  Article and section headings of this Agreement are for reference purposes only and are to be given no effect in the construction or interpretation of this Agreement.

Section 10.2 **Article, Section, Schedule and Exhibit References.**  Except as otherwise specifically provided, any reference to any article, section, schedule or exhibit will be deemed to refer to such article or section of or schedule or exhibit to this Agreement.

Section 10.3. **Usage.**  Whenever the plural form of a word is used in this Agreement, that word will include the singular form of that word.  Whenever the singular form of a word is used in this Agreement, that word will include the plural form of that word.  The term "or" does not exclude any of the items described.  The term "include," or any derivative of such term, does not mean that the items following such term are the only types of such items.

Section 10.4. **Drafting.**  Neither this Agreement nor any provision contained in this Agreement may be interpreted in favor of or against any party hereto because such party or its legal counsel drafted this Agreement or such provision.

Section 10.5. **Entire Agreement.  THE EXHIBITS AND SCHEDULES TO THIS AGREEMENT ARE HEREBY INCORPORATED AND MADE A PART HEREOF AND ARE AN INTEGRAL PART OF THIS AGREEMENT.  THIS AGREEMENT (INCLUDING SUCH EXHIBITS AND SCHEDULES) REPRESENTS, AND IS INTENDED TO BE, A COMPLETE STATEMENT OF ALL OF THE TERMS AND THE ARRANGEMENTS BETWEEN THE PARTIES TO THIS AGREEMENT WITH RESPECT TO THE MATTERS PROVIDED FOR IN THIS AGREEMENT, AND SUPERSEDES ANY AND ALL PREVIOUS ORAL OR WRITTEN AND ALL CONTEMPORANEOUS ORAL AGREEMENTS, UNDERSTANDINGS, NEGOTIATIONS AND DISCUSSIONS BETWEEN THE PARTIES TO THIS AGREEMENT WITH RESPECT TO THOSE MATTERS.**

Section 10.6. **GOVERNING LAW.  GOVERNING LAW; VENUE.  THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF SOUTH CAROLINA WITHOUT REFERENCE TO THE PRINCIPLES OF CONFLICTS OF LAWS OR ANY OTHER PRINCIPLE THAT COULD RESULT IN THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION.  THE PARTIES HEREBY WAIVE ANY RIGHT TO A JURY TRIAL IN ANY SUIT, ACTION, OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.**

Section 10.7. **Expenses.**

(a)  Except as otherwise expressly provided in this Agreement and regardless of whether the transactions contemplated in this Agreement are consummated, each of the parties to this Agreement will bear its own expenses (including, without limitation, fees and disbursements of its counsel, accountants, financial advisors and other experts), incurred in connection with the preparation, negotiation, execution, delivery and performance of this Agreement, each of the other documents and instruments executed in connection with or contemplated by this Agreement and the consummation of the transactions contemplated by this Agreement and thereby.

(b)  If attorneys' fees or other costs are incurred to secure performance of any obligation under this Agreement, to establish damages for the breach thereof or to obtain any other appropriate relief, whether by way of prosecution or defense, the prevailing party will be entitled to recover reasonable attorneys' fees and costs incurred in connection therewith.

Section 10.8.  **Notices.**  All notices, requests, demands and determinations under this Agreement (other than routine operational communications) must be in writing and will be deemed duly given: (a) when delivered by hand, (b) one day after being given to an express courier with a reliable system for tracking delivery, (c) when sent by confirmed facsimile with a copy sent by another means specified in this provision or (d) five days after the day of mailing, when mailed by registered or certified mail, return receipt requested, postage prepaid, and addressed as set forth below.  A party may from time to time change its address or designee for notification purposes by giving the other written notice of the new address or designee and the date upon which it will become effective.

If to Purchaser:

Xiingo.com, Inc.
Attn: Vishal Shah, CEO
2035 N Mason Drive Unit 504,
Katy, Texas 77449-6879
Email:  vshah@xiingo.com

with a copy to:

James M. Hughes
1100 N.E. Loop 410, Suite 900
San Antonio, TX  78209
E-mail:  j_hughes@tetco.com

If to Seller:

Alison South Marketing Group
c/o Mike Thomas, CEO
132 Chesterfield St. S
Aiken, SC 29801
Email:  mike@alisonsouthmarketing.com

with a copy to:

Kevin E. Pethick
115 Hearthstone Drive
Aiken, SC 29803
Email:  Kevin@austinpethick.com

Section 10.9.  **Severability.**  The invalidity or unenforceability of any provision of this Agreement will not affect the validity or enforceability of any other provision of this Agreement, each of which will remain in full force and effect, so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in a manner materially adverse to any party.

Section 10.10.  **Binding Effect; No Assignment.**  This Agreement will be binding upon and inure to the benefit of the parties and their respective successors and assigns.  Nothing in this Agreement will create or be deemed to create any Third-Party beneficiary rights in any Person not party to this Agreement except to the extent such obligations are specifically assumed.  No assignment of this Agreement or of any rights or obligations under this Agreement may be made by any party (by operation of Law or otherwise) without the prior written consent of each of the other parties to this Agreement and any attempted assignment without such required consents will be void; provided, however, that Purchaser may assign to one or more of its Affiliates any or all of its rights under this Agreement without the prior written consent of any other party, but no such assignment by Purchasers will release Purchasers from any of its obligations under this Agreement.

24

Section 10.11.  **Amendments.**  This Agreement may be amended, supplemented or modified, and any provision hereof may be waived, only by written instrument making specific reference to this Agreement signed by Purchaser and Seller.  Except as otherwise provided in this Agreement, no action (other than a waiver) taken pursuant to this Agreement, including, without limitation, any investigation by or on behalf of any party, will be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained in this Agreement.  The waiver by any party to this Agreement of a breach of any provision of this Agreement will not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  Except as otherwise expressly provided in this Agreement, no failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy under this Agreement will operate as a waiver thereof, nor will any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

Section 10.12.  **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

IN WITNESS WHEREOF, the parties to this Agreement have executed this agreement as of the date and year first above written.

"Seller"

_____
MICHAEL THOMAS

_____
KATHLEEN SANDERS

"Purchaser"

**XIINGO.COM, INC.**

_____
VISHAL SHAH, CEO

_____
Priya (Jan 5, 2023 19:04 CST)
PRIYA BETALA, CFO

## LIST OF EXHIBITS AND DISCLOSURE SCHEDULES

**Exhibits**:

Exhibit "A" – Form of Certificate of Amendment for Company **- Intentionally Deleted** *(form provided – to be handled post-Closing)*

Exhibits "B-1" through "B-3" – Forms of Non-Competition and Non-Solicitation Agreement **- Intentionally Deleted (see *Employment Agreements for these terms*)**

Exhibit "C-1" through "C-3"– Forms of Employment Agreement for Thomas, Sanders and South – **(Not attached – Forms have been agreed to by parties and will be signed simultaneously as closing docs)**

Exhibit "D" – Form of Stock Power **- Not attached – Form has been agreed to by parties and will be signed simultaneously as closing docs)**

**Disclosure Schedules**:

Excluded Assets [Schedule 2.3]

Capitalization [Schedule 3.4]

Recent Liabilities [Schedule 3.6]

Recent Development [Schedule 3.7]

Leased Equipment [Schedule 3.8(a)]

Miscellaneous Contracts at Leased Property [Schedule 3.8(d)]

Special Contracts [Schedule 3.9]

Key Customers [Schedule 3.10]

Business Intellectual Property [Schedule 3.11(a)]

Registered Intellectual Property [Schedule 3.11(b)]

Company Insurance Policies [Schedule 3.12]

Officers and Employees, Including Key Employees [Schedule 3.13]

Verbal & Written Bonus, Profit Sharing Compensation Agreements [Schedule 3.13(d)]

Employee Agreements [Schedule 3.13(e)]

Benefit Agreements [Schedule 3.14]

Additional Employee Benefit Agreements [Schedule 3.14(b)]

Legal Matters [Schedule 3.15]

Permit Matters [Schedule 3.16] - *NOT APPLICABLE*

Environmental Matters [Schedule 3.17] - *NOT APPLICABLE*

Environmental Reports [Schedule 3.17(e)] - *NOT APPLICABLE*

Legal Proceedings [Schedule 3.18]

Tax Matters [Schedule 3.19] - *NOT APPLICABLE*

Foreign Registrations and Assumed Names [Schedule 3.21] - *NOT APPLICABLE*

4875-1156-6646, v. 14