IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | |
|---|---|
| **XIINGO.COM, INC.; FULL CIRCLE HOLDINGS, LLC; and ALISON SOUTH MARKETING GROUP, LLC;**<br><br>      Plaintiffs,<br><br>v.<br><br>**MICHAEL THOMAS; ASHLEY THOMAS; WESLEY ROBERTS; KATHLEEN SANDERS; and NEXT MARKETING GROUP, INC.;**<br><br>      Defendants. | CIVIL ACTION<br>FILE NO. 1:23-cv-00184-JRH-BKE |

### PLAINTIFFS' MOTION FOR ORDER TO SHOW CAUSE AND REQUEST FOR HEARING

The captioned matter is presently before the Court on Plaintiffs' motion for preliminary injunction. On December 6, 2023, the Court granted Plaintiffs' motion for a temporary restraining order ("TRO"). (Doc. no. 14.) Under the Court's TRO, Defendants Michael Thomas, Ashley Thomas, Wesley Roberts, and Next Marketing Group, Inc., (for the purposes of this motion, and specifically excluding Ms. Sanders, collectively "Defendants") are "restrained and enjoined from competing against Full Circle/Alison South in Georgia and South Carolina." (Id. at 3.) Defendants were also ordered to cooperate with Plaintiffs' forensic examination of "all electronic devices and media in the possession, custody, or control of Defendants." (Id. at 4.) For the following reasons, Plaintiffs request the Court:

   (1) to order Defendants to show cause why they should not be held in contempt for violating the TRO; and

   (2) to hold a hearing to determine whether Defendants should be held in civil contempt for violating the TRO.

1

### A. Defendants competed against Plaintiffs after entry of the TRO.

Plaintiffs believe Defendants are violating both the letter and the spirit of the TRO by continuing to compete with Plaintiffs. It appears these violations are knowing and deliberate. Based on the record set forth in this motion, Plaintiffs believe contempt and sanctions are warranted, but at minimum, Plaintiffs move the court to hold hearing at which the Defendants should cause as to why they should not be held in contempt and sanctioned.

#### 1. Background of the TRO and Forensic Examination.

As background, Plaintiffs filed their Complaint on December 4, 2023, and moved for TRO on December 5, 2023. (See Doc. nos. 1-9.) Plaintiffs provided a copy of all documents filed in this case, including the TRO motion, to all Defendants and their counsel, Charles George, on December 4, 2023, *before* they were filed, and again on December 5, 2023, *after* they were filed. (See Ex. A, Email Exchange between Pls.' Counsel and Defs.' Counsel, Dec. 4 and 5, 2023.) The Court then scheduled a hearing on the motion for TRO for 3:00 p.m. on December 6, 2023. (See Doc. no. 10.) The notice of hearing was filed at 10:33 a.m. (Id.) As a courtesy, Plaintiffs' counsel e-mailed Mr. George at 10:55 a.m. notifying him of the upcoming hearing. (See Ex. B, Email from Pls.' Counsel's to Defs.' Counsel, Dec. 6, 2023.) Mr. George filed a formal entry of appearance on behalf of Defendants at 11:46 a.m., but did not attend the hearing. (See Doc. no. 12.)

After reviewing the record and evidence presented by Plaintiffs at the hearing, the Court granted the TRO "restrain[ing] and enjoin[ing] [the Defendants] and their agents/employees . . . from competing against Full/Circle/Alison South in Georgia and South Carolina," and the Clerk filed the order into the record at 4:50 p.m. on December 6, 2023. (Doc. no. 13-14.) A filing notice and copy of the signed order was automatically sent to Mr. George via the CM/ECF filing system. (Id.) Plaintiffs' counsel also sent a service copy of the order to Mr. George via email at 6:49 p.m.

on December 6, 2023. (See Ex. C, Email and Letter from Pls.' Counsel's to Defs.' Counsel, Dec. 6, 2023.) Thus, no later than 6:49 p.m. on December 6, 2023, Defendants had actual notice, through counsel, of the TRO enjoining them from engaging in competitive activities with Plaintiffs. See Fed. R. Civ. P. 5(d); Williams v. Clinch Cnty., Ga., 231 F.R.D. 700, 702 (M.D. Ga. 2005) (explaining service of subsequent pleadings, motions, and other filings under Rule 5 "may be served on an attorney who represents a party to a lawsuit," and service can be perfected electronically "through the court's transmission facilities" via the CM/ECF filing system under Rule 5(b)(2)(D).)

Moreover, on December 7, 2023, at 8:37 a.m., Mr. George emailed Plaintiffs' counsel advising that "I have talked to my clients, and I will accept service for Mike, Ashley, Wes and Next." (Ex. D, Email from Defs.' Counsel to Pls.' Counsel, Dec. 7, 2023.) At this point, defense counsel had also presumably explained the TRO to his clients, as would have been ethically required. See Ga. R. Prof. Cond. 1.4(a)(3). On Friday, December 8, 2023 at 8:59 a.m., Mr. George sent his acknowledgement of service of all the case filings, including the Court's TRO, on behalf of Defendants. (See Ex. E, Email from Defs.' Counsel to Pls.' Counsel, Dec. 8, 2023; Doc. no. 15.)

Originally, the TRO was to remain in effect for 14 days. (Doc. no. 14.) However, in the days following entry of the TRO, the parties filed joint motions to extend the TRO and to postpone the hearing through January 31, 2023, which the Court granted. (Doc. no. 18-20, 21-24.)[1] Defendants have been fully aware of the TRO since December 6, 2023. Nonetheless, Plaintiffs have found substantial evidence that Defendants have violated the TRO, and it appears likely are continuing to violate it.

---

[1] On 1/22/2024, the Court rescheduled the hearing to February 1, 2024 at 10:00 a.m. (See Case Docket.)

3

The TRO permitted Plaintiffs to conduct forensic examination of the Defendants' electronic devices and media, including cell phones, computers, and cloud-based accounts. (Doc. no. 14 at 4.) Defendants indicated that the earliest they could produce any devices was December 11, 2023. Plaintiff's forensic experts, Sullivan Strickler, imaged the data from Ashley and Mike Thomas's devices on December 11, 2023 and Wes Roberts' devices on December 12, 2023. After some back and forth with counsel for Defendants, Sullivan Strickler were finally able to access most of the email accounts associated with Defendants, except for Mike Thomas' account with BJM Group, which he refused to provide.

Based on the time it took to get the devices imaged and for Sullivan Strickler to extract and analyze the data, as well as for defense counsel to conduct privilege review, Plaintiffs have only reviewed some of the emails and text messages obtained from the forensic search. Based only on this limited search, Plaintiffs have already identified numerous communications that show Defendants Ashley Thomas, Wes Roberts, Next Marketing Group, and Mike Thomas engaged in competitive conduct expressly prohibited by the TRO and which indicate such competition is likely ongoing. Plaintiffs have also received correspondence directly from several ASM clients a*fter* December 6, 2023, advising Plaintiffs that they are now doing business with Next Marketing Group. The evidence gathered to date indicates that Defendants, individually and in concert, have blatantly violated and continue to violate the Court's TRO by competing with Plaintiffs.

**2. Plaintiffs Receive Indications that Defendants are Continuing to Compete Despite the TRO.**

Plaintiffs first became concerned that Defendants were violating the TRO on December 11, 2023, five days after entry of the TRO. On that day, ASM received a request from a former client, Model Performance Group ("MPG"), a South Carolina-based client/customer, which had recently terminated its services with ASM and with whom Mike and Ashley Thomas met shortly

4

before Mike Thomas's departure (See Doc. no. 8 at 4). MPG's principal, Jeremy O'Donnell, contacted an ASM employee on December 11, 2023 and asked the employee, in light of Mr. O'Donnell's decision to terminate ASM's services, to transfer his company's website to a GoDaddy account associated with Wes Roberts and Next Marketing Group. (See Ex. F, Email from J. O'Donnell, Dec. 11, 2023, attached to Email from Defs.' Counsel to Pls.' Counsel, Dec. 12, 2023 at 3-10.)

Plaintiffs immediately contacted counsel for the Defendants regarding this flagrant violation of this Court's order. (See id., Email from Defs.' Counsel to Pls.' Counsel, Dec. 12, 2023 at 1.) It took nine days before Defendants offered a weak explanation and a letter from Mr. O'Donnell, clearly generated in collusion with the Defendants, trying to explain away the situation as a misunderstanding. In that letter, Mr. O'Donnell represented (1) he had reviewed all of his communications with Mike and Ashley Thomas and found that were primarily "personal matters, and unrelated business matters," which he did not believe would be "relevant to the case;" (2) Ashley Thomas was merely an "employee" whom he had hired in November of 2023 to help him with "business operations" and that only a small part of that was "marketing;" and (3) that "[a]ll communications between myself and Defendants Mike and Ashley, while potentially suspect, have been above board and unrelated to the MPG/ASM relationship." (Ex. G, J. O'Donnell Letter to Pls.' Counsel, Dec. 20, 2023.)

However, a review of Mr. O'Donnell's communications with Mike and Ashley Thomas tells a different story and demonstrates that not only do the Defendants have little regard for this Court's orders, but they are willing to recruit their friends and clients to lie for them. First, on September 25, 2023, over a month prior to MPG's termination of its account with ASM on December 11, 2023 but shortly after Mr. Thomas's resignation, Mr. Thomas and Mr. O'Donnell

5

exchanged text messages in which Mr. O'Donnell told Mr. Thomas "Now we just need to organize a hostile takeover of AS [Alison South] in such a way so you keep the bulk of your cash. Then we move Kate along and hire Ashley back. Then you and I take over the world. Or at least Aiken." (Ex. H, Text Messages and E-mails of M. Thomas, at 18.) Mr. O'Donnell then texted Mr. Thomas "my work address is Jeremy@ModelPerformance.com for any MPG business. For the rest of our plans the Att.net is probably best." (Id.)

On October 31, 2023, Mr. O'Donnell sent an e-mail to his account representative at ASM, Taylor Buzhardt, notifying her that he was terminating his account with them. (Doc. no. 8 at 4-5.) Just a few days later, Mr. O'Donnell forwarded that e-mail to Mr. Thomas at his personal e-mail account—presumably to keep him updated on his progress in terminating ASM. Id. (Ex. H at 27-28). Despite Mr. O'Donnell's assertions in his December 20, 2023 response to Plaintiffs' counsel that Mrs. Thomas his "employee" so of November 1, 2023, on November 22, 2023, Mrs. Thomas sent Mr. O'Donnell an invoice for $2,000—ostensibly for "Services – Operations Coordinator" — and blind carbon-copies her Next Marketing e-mail account. (Ex. G at 3-4; Ex. H at 29-30.) It would seem highly unusual for an "employee" to need to invoice her "employer," and the more plausible explanation is that this arrangement is yet another iteration of the Thomas' convoluted quasi-employment consulting shams, which they seem to believe is a valid way to avoid the restrictions of the non-competition agreements.

The sham nature of this relationship becomes more apparent, when on December 2 and December 4, 2023, Mrs. Thomas e-mails Mr. O'Donnell directly from her Next Marketing account to set up a meeting. (Ex. H at 31.) This is followed on December 5, 2023 by Mrs. Thomas providing Mr. O'Donnell with information on how to transfer his website to Next Marketing's Go Daddy account and emphasizes that <u>he</u> will need to make sure to request any login information, likely

6

because it would raise further questions if Mrs. Thomas were to request the site credentials. (Ex. H at 32.) The fact that Mr. O'Donnell then e-mails ASM five days later to have his website transferred demonstrates that Next Marketing took no action to notify its clients that it was now subject to the Court's TRO and could not provide services and that Next Marketing never had any intent of complying with the Court's TRO.

### 3. Plaintiffs Obtain Direct Evidence of Ashley Thomas and Next Marketing Violating the TRO.

Additional review of the Defendants' emails obtained the forensic examination provide concrete evidence that Defendants Ashley Thomas, Wes Roberts, and Next Marketing Group have continued to engage in their competing marketing business since the entry of the TRO. In October of 2023, Ashley Thomas "signed up" Burke Health in Waynesboro, Georgia, a former ASM client and a business located in the state of Georgia, as a Next Marketing client. (Doc. no. 9.)

On November 28, 2023, Mrs. Thomas emailed Burke Health representatives to follow up on a meeting she had with their executives about Next Marketing's new marketing/ad campaign. (Ex. I at 8-10.) Mrs. Thomas and Burke Health continued to correspond about this campaign, including discussing details of a video shoot for an ad spot. (Id. at 5-8.) On November 6, 2023, at 3:57 PM, Mike Hester, the CEO of Burke Health, e-mailed Mrs. Thomas about coordination for the video shoot, carbon-copying Sarah Tinsley, at Burke Health. (Id. at 4). Ms. Tinsley followed up on this e-mail at 8:09 a.m. on December 7, 2023, after the Court had entered the TRO and the Defendants had notice of the TRO, proposing dates for the video shoot of December 14 or 15, 2023. (Id. at 3.) Mrs. Thomas responded to Ms. Tinsley's e-mail at 12:12 p.m. on December 7, 2023, not to inform Ms. Tinsley that she would need to postpone the video shoot due to the fact she was prohibited from assisting with the video shoot by the order of the United States District Court, rather she provided coordinating instructions for the shoot and made plans to schedule the

7

shoot for December 14, 2023—**a date on which she would still be subject to this Court's TRO**. (Id. at 2-3.) Further, Mrs. Thomas continued to engage in discussions with Burke Health representatives about the contents of the video shoot, including discussing potential interviewees and advising Burke Health representatives about other dates for the video shoot, as well as to plan additional marketing tasks. (Id. at 1; Ex. J at 1-2.)

Similarly, on Friday, December 8, 2023, nearly two days after the entry of this Court's TRO, Mike Hester e-mailed Ashley Thomas regarding a holiday ad that was supposed to be submitted to a local paper, but for which Mrs. Thomas had missed the deadline. (Ex. K at 4-5.) In that e-mail, Mr. Hester specifically asked whether she was "having any internal issues that [Burke Health] need[ed] to be aware of." (Id. at 4.) Rather than informing Mr. Hester that in fact, she and her company were subject to this Court's TRO and could not complete the assignment, Mrs. Thomas responded at 3:12 p.m. with a number of excuses and then stated that she had e-mailed the paper and they could still submit the ad. (Id. at 1.) She then proceeded to submit the ad to the newspaper at 3:17 p.m. on December 8, 2023. (Ex. L at 3.) After Mr. Hester requested a change to the ad, Mrs. Thomas then re-submitted the ad to the newspaper at 3:52 p.m. on December 8, 2023. (Ex. M at 1.) Further, Mrs. Thomas submitted a copy for another ad to Burke Health staff at 9:10 p.m. on December 8, 2023. (Ex. N at 1).

### 4. Plaintiffs Discover Additional Direct Evidence that Defendants are Violating the TRO.

Also on December 7-8, 2023, Ashley Thomas, using her Next Marketing Group email address, communicated with Chris Withers, President of Azalea Outdoor, an outdoor advertising agency based in Augusta that leases billboards in Georgia and South Carolina.[2] (Ex. O, Email

---

[2] https://www.azaleaoutdoor.com

8

Exchange between M. Thomas, A. Thomas and C. Withers, Nov. 15 and Dec. 5-8, 2023 at 1-7.) ASM contracts with Azalea Outdoor when ASM clients need billboards for their marketing campaigns. In November 2023, Mrs. Thomas told at least one ASM client, The Chandler Law Firm, that she was working on "renegotiations of the current Alison South billboards" for Chandler's new account with Next Marketing Group. (Id., Email Exchange between A. Thomas and E. Chandler, Nov. 16, 2023 at 8-9.) From these communications, it appears Mrs. Thomas was negotiating Azalea Outdoor's billboard rates "for [Next Marketing Group] and for [its] clients even though [it is] not an agency [of record]" *after* December 6, 2023. (Id. at 3.) Mr. Withers responded "there's just certain numbers that I've always done with you guys being Alison South in the past" but seemed to work out a mutually agreeable rate for Next Marketing Group and its clients. (Id. at 2-3.) These communications further evidence Mrs. Thomas was still taking actions to compete with ASM in Georgia/South Carolina well after the TRO was entered.

Additionally, on Saturday, December 9, 2023, Amber Watson emailed Wes Roberts asking him to create a new business card design for her as CEO of her dance company, "Unity Dance Co." located in Aiken, South Carolina.[3] (Ex. P, Email Exchange between A. Watson and W. Roberts, Dec. 9, 2023 at 1-2.) This email also included a list of details and style preferences for the marketing design. (Id. at 1.) While Plaintiffs believe Ms. Watson is an employee or agent of Next Marketing Group, this communication appears to reflect a separate arrangement between Ms. Watson and Next Marketing Group to perform marketing services for her independent business—services ASM could perform.

Even after Defendants were on notice that Plaintiffs were aware of their violations of the TRO, Defendants apparently continued to violate the TRO. On December 18, 2023, Plaintiffs

---

[3] https://unitydanceco.com/

9

received information from a vendor and client of ASM with pictures of a vehicle wrap the vendor had completed for Victory Baptist Church. The ASM employee, being familiar with the vendor's file-naming convention, immediately recognized that the company responsible for the wrap design was Next Marketing Group. When this was brought to Defendants' attention, it was likewise met with series of excuses that Next Marketing Group was only involved in arranging the vehicle wrap with the vendor to receive a "discount" due to Ashley Thomas's professional relationship with the vendor. (See Ex. Q, E-mail from Defs.' Counsel to Pls.' Counsel, Dec. 20, 2023.) With the vendor being a graphic design company, the only logical conclusion as to why Mrs. Thomas would have any "professional relationship" is because she (and Next Marketing Group) are in fact performing marketing services in competition with Plaintiffs and in violation of the TRO.

In short, based on the contents of the Defendants' email up to the time it was collected, Defendants have never shown any sign of stopping or slowing down their competitive activities since the entry of the TRO on December 6, 2023. Plaintiffs strongly suspect that Defendants have continued these efforts through the filing of this motion.

### 5. Based on Other Information in the Case it is Probable that Mike Thomas is Assisting the other Defendants in Violating the TRO.

Based on other evidence obtained through the forensic examination of Defendants' devices and the course of dealing established by this evidence, it seems very likely that Mike Thomas is assisting the other defendants to violate the TRO. First, the evidence suggests that while employed with Full Circle and ASM as their CEO, Mr. Thomas began planning with his wife, Ashley Thomas, and Wes Roberts, then an independent contractor working for ASM, to form Next Marketing Group in order to compete with Plaintiffs. As early as August 2023, while Mike Thomas was still CEO for Plaintiffs, Mr. Thomas had multiple text conversations with Wes Roberts regarding the creation of Next Marketing Group, including detailed discussions about its name,

10

brand, operations, website, logo design, potential clients, and overall marketing strategy, which continued through September 2023. (Ex. H at 1-21.) These communications show that Mr. Thomas intended to direct Next Marketing Group from behind the scenes, using his wife and Wes Roberts as the face of the company, as he knew that he was restrained from competing with ASM under his restrictive covenants. (Id.) While it appears Mr. Roberts and/or Mr. Thomas attempted to delete these incriminating text messages to hide their tracks, Sullivan Strickler, was able to retrieve many of them. (Id.)

On September 21, 2023—the same day Mr. Thomas resigned—Mr. Thomas asked Roberts to give him Roberts's login and password to ASM's "Basecamp" database, as Mr. Thomas's own access to Basecamp had been terminated. (Ex. H at 12.) Mr. Thomas "grabb[ed] client contacts"—apparently, ASM's entire customer contact list—but asked Roberts to download "marketing pitch books" and file materials for then-ASM customers Victory Baptist Church and Bela Dentistry, which Thomas apparently hadn't been able to steal. (Id. at 11-12.) Also on September 21, 2023, Mr. Thomas directed his wife to "wipe it all"—*i.e.*, his texts and emails—from his ASM phone and laptop. (Id. at 8.)

On September 21, 22, 23, and 27, 2023, Mr. Thomas and Roberts worked on Next Marketing Group's name, logo, and branding, along with setting up the company's website, Facebook, Instagram, and LinkedIn pages, all of which would be designed and intended to compete directly with ASM. (Ex. H at 9-21.) Meanwhile, on September 26, 2023, Mr. Thomas asked Roberts to obtain ASM's "master site login list," as well as files for ASM customer "Houndslake Neighborhood Association."[4] (Ex. H at 19.) That same day, Mr. Thomas and Roberts discussed plans to bring Victory Baptist, Houndslake Neighborhood, Model Performance Group, and BJM

---

[4] Of course, this was only the tip of the iceberg—Roberts would eventually download over 2,300 ASM files before ASM terminated his access to its databases. (See Doc. no. 9 at 9.)

11

Group over to Next Marketing Group at its "first 4 clients." (Id. at 20.) In fact, with respect to BJM Group, Mr. Thomas and Roberts began discussing as early as August 30, 2023, a plan for Mr. Thomas to serve as BJM Group's chief marketing officer with support from Roberts and Next Marketing Group. (Id. at 4.)

Also in late September, Mr. Thomas successfully recruited Amber Watson—a recently terminated ASM employee—to join Next Marketing Group and begin soliciting ASM customers, including Chandler Law Firm, to move their business to Next Marketing Group. (Doc. no. 9 at 6.) Over the next several months, Mr. Thomas coordinated and directed Ms. Watson's efforts to convince key ASM clients, including helping to convince the John Mobley Law Firm to leave ASM and move their business to Next Marketing Group.[5] (Id. at 7-8.)

On September 28, 2023, the day Ms. Watson was terminated and also Mr. Thomas's last day at Alison South, Mr. Thomas shared an email with Ms. Watson from someone named Dick Rudisill entitled "Foreign Fucks" in which he told Mr. Thomas that "tomorrow the gloves come off" and that they, presumably Plaintiffs' new owners, "can't track [Mr. Thomas's] number or emails," before encouraging him to go "balls to the wall to help client losses grow and to join this hot new marketing company that has just sprung up in the area." (Doc. no. 9, Ex. F.) It's almost certain Mr. Rudisill was referring to Next Marketing Group as the hot new marketing company and was encouraging Mr. Thomas to help Next Marketing steal clients of ASM.

On November 8, 2023, Wes Roberts sent an email to Mike Thomas with the banner "clients no longer at asm 11/7," followed by a list expressly naming *twenty-five* ASM former clients, including Bela Dentistry and Wayne's Automotive & Towing. (Ex. H at 24-25.) As noted above,

---

[5] Defendants claim Ms. Watson is/was not a Next Marketing Group employee/agent, but this appears to be specious—she gave Mr. Chandler her Next Marketing Group email address: amber@nextmarketinggroup.com. (Doc. no. 9-7 at 2.)

it appears that shortly before Mr. Thomas resigned from Full/Circle ASM in September, he downloaded trade secret information in the form of marketing pitches for Bela Dentistry. Shortly after Mr. Thomas resigned, Bela Dentistry terminated its relationship with ASM. By November 2023, it appears Mr. Thomas and Roberts had begun working to develop marketing plans and materials for Bela Dentistry. (See, e.g., Ex. H at 25-26.) On December 9, 2023, Amber Watson sent an email to Mike Thomas attaching several text messages between them. (Id. at 22-23.) While most are undated, Plaintiffs suspect they were sent sometime between October and November 2023. In the texts, Mike Thomas told Amber Watson that "Wayne's putting in their notice," referring to Wayne's Automotive & Towing. (Id.) Amber responded "whatttt?!? Coming to you?," to which Mr. Thomas replied, "I don't own an ad. Co. [advertisement company] but ashley might be helping (winking face emoji)." (Id.) Ms. Watson answered "Facts (winking face emoji)." (Id.)

From November 7 through 13, 2023, after Mike had resigned from ASM in September, he sent emails to Wes Roberts, Ashley Thomas, and Victory Baptist Church representatives, discussing details of Next Marketing Group's marketing services for Victory Baptist Church. (Ex. R., Email Exchange between M. Thomas, A. Thomas, W. Roberts, and Victory Baptist, Nov. 7-13, 2023.) At one point, Ashley Thomas responded "They are already introducing us as Mike and Ashley Thomas of Alison South . . . that now have a consulting firm and also a new marketing company called Next." (Id. at 2.)

Tellingly, it appears from Plaintiffs' counsel's review of the forensic examination results thus far that Mr. Thomas almost immediately tapered his direct email and text communications with the other Defendants and ASM clients *after* Plaintiffs' counsel sent a detailed demand letter on November 20, 2023. The letter advised that Plaintiffs knew about Mr. Thomas's ongoing, direct involvement with Next Marketing Group and his communications with ASM clients. Although

13

Mr. Thomas apparently limited his written communications to avoid getting caught, Next Marketing Group has continued to work for former ASM clients that Mr. Thomas had represented on behalf of Next Marketing Group, such as Victory Baptist and MPG, *after* the TRO was entered. (See, e.g., Exs. F-G, R.) In short, based on Defendants prior course of dealing, Plaintiffs have reason to believe that Mike Thomas continued to work and/or consult <u>directly</u> for Ashley Thomas, Wes Roberts, and Next Marketing Group after December 6, 2023 and assisted in their violations of the TRO. Accordingly, Plaintiffs request the Court:

> (1) to order Defendants to show cause why they should not be held in contempt for violating the TRO; and
>
> (2) to hold a hearing to determine whether Defendants should be held in civil contempt for violating the TRO.

### B. **The Court has Authority to Order Defendants to Show Cause and Impose Sanctions.**

The Court has the authority to order Defendants to show cause why should not be held in contempt and conduct a hearing to determine whether defendants have violated the TRO. <u>Citronelle-Mobile Gathering, Inc. v. Watkins</u>, 943 F.2d 1297, 1304 (11th Cir. 1991). Ordinarily, a hearing should be held before a party can be held in contempt. See, e.g., <u>id.</u> Injunctions such as the Court's TRO are "enforced through the trial court's civil contempt power." <u>Reynolds v. Roberts</u>, 207 F.3d 1288, 1298 (11th Cir. 2000). The Eleventh Circuit has explained the applicable procedure:

> If the plaintiff (the party obtaining the writ) believes that the defendant (the enjoined party) is failing to comply with the decree's mandate, the plaintiff moves the court to issue an order to show cause why the defendant should not be adjudged in civil contempt and sanctioned. The plaintiff's motion cites the injunctive provision at issue and alleges that the defendant has refused to obey its mandate. If satisfied that the plaintiff's motion states a case of non-compliance, the court orders the defendant to show cause why he should not be held in contempt and schedules a hearing for that purpose. At the hearing, if the plaintiff proves what he has alleged in his motion for an order to show cause, the court hears from the defendant. At the end of the day, the court determines whether the defendant has complied with the injunctive provision at issue and, if not, the sanction(s) necessary to

ensure compliance.

Reynolds, 207 F.3d at 1298. (internal citations omitted).

The Court always has the authority to sanction parties for disobeying a court order. See, e.g., Snider-Hancox v. NCL Bahamas Ltd., No. 17-20942-CIV, 2018 WL 6448765, at *8 (S.D. Fla. Dec. 3, 2018) (concluding failure to make phone available for forensic examination warranted sanctions under both the court's inherent power and Rule 37(b)). It is a "basic proposition that all orders and judgments of courts must be complied with promptly." Maness v. Meyers, 419 U.S. 449, 458 (1975). "If a person to whom a court directs an order believes that order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal." Id. "Persons who make private determinations of the law and refuse to obey an order generally risk criminal contempt even if the order is ultimately ruled incorrect." Id.; see also Kleiner v. First Nat. Bank of Atlanta, 751 F.2d 1193, 1208 (11th Cir. 1985) ("**As a fundamental proposition, orders of the court *must be obeyed*** until reversed by orderly review or disrobed of authority by delay or frustration in the appellate process.... If the order appears to be incorrect, the proper course of action lies in review[.]" (bold emphasis added; italics original).) If Defendants "deliberately disobeyed the Court's instructions . . . [t]his fact should be neither forgotten nor minimized." Mawulawde v. Bd. of Regents of Univ. Sys. of Georgia, No. CV 105-099, 2007 WL 2460774, at *6 (S.D. Ga. Aug. 24, 2007) (citing Kleiner, 751 F.2d at 1208).

To establish contempt, Plaintiffs must demonstrate by clear and convincing evidence that "(1) the allegedly violated order was valid and lawful; (2) the order was clear and unambiguous; and (3) the alleged violator had the ability to comply with the order." Georgia Power Co. v. NLRM, 484 F.3d 1288, 1291 (11th Cir. 2007). The "clear and convincing" standard requires a showing greater than a preponderance of the evidence but less than beyond a reasonable doubt. Georgia

Power, 484 F.3d at 1291. Once the movant makes a *prima facie* showing that that the non-movant has violated a court order, the burden shifts to the non-movant "to produce evidence explaining his noncompliance." Watkins, 943 F.2d at 1301; see also Fed. Trade Comm'n v. Partners in Health Care Ass'n, Inc., No. 14-23109-CIV, 2015 WL 13567706, at *3 (S.D. Fla. Jan. 6, 2015) ("Once a movant establishes by clear and convincing evidence that a court order has been violated, the burden of production shifts to the purported contemnor to produce evidence explaining his non-compliance.").

In this regard, "[t]he absence of willfulness is not a defense to a charge of civil contempt.... [S]ubstantial, diligent, or good faith efforts are not enough; the only issue is compliance.... [I]n civil contempt proceedings the question is not one of intent but whether the alleged contemnors have complied with the court's order." Fed. Trade Comm'n v. Laptop & Desktop Repair, LLC, No. 1:16-CV-3591-AT, 2016 WL 10805749, at *4 (N.D. Ga. Dec. 8, 2016) (quoting FTC v. Leshin, 618 F.3d 1221, 1232-33 (11th Cir. 2010)).

"A district court enjoys 'wide discretion' to craft a remedy for civil contempt, which is measured 'solely by the requirements of full remedial relief.'" Planes, 2019 WL 3024895, at *11 (quoting United States v. City of Miami, 195 F.3d 1292, 1298 (11th Cir. 1999)). The Court has the power to impose coercive and compensatory sanctions. Watkins, 943 F.2d at 1304 (citing In re Chase and Sanborn Corp. v. Nordberg, 872 F.2d 397 (11th Cir. 1989)). Contempt may serve two purposes, it "can be either coercive, which is intended to make the recalcitrant party comply, or compensatory, which 'reimburses the injured party for the losses and expenses incurred because of his adversary's noncompliance ... '" Sizzler Family Steak Houses v. Western Sizzlin Steak House, Inc., 793 F.2d 1529, 1534 (11th Cir. 1986) (citing Rickard v. Auto Publisher, Inc., 735 F.2d 450, 458 (11th Cir. 1984)). Sanctions may be awarded in the form of attorney fees. An award

16

of attorney fees to the injured party in a civil contempt case is within the Court's discretion. Sizzler, 793 F.2d at 1534 (internal cit. omitted). "[R]eimbursement to a prevailing movant may include 'expenses reasonably and necessarily incurred in the attempt to enforce compliance.'" Id. at 1534 (internal cit. omitted). Prospective fines may also be imposed as sanctions in a contempt proceeding where "violations have been flagrant and lesser remedies appear likely to fail." Sizzler, 793 F.2d at 1536 (citing NLRB v. A.W. Thompson, Inc., 651 F.2d 1141, 1145 (11th Cir. 1981).)

Here, the Court's TRO was valid and lawful. Likewise, the order was clear and unambiguous: Defendants must not compete against Full Circle/Alison South in Georgia and South Carolina and must cooperate fully with forensic examination of their devices and data. (See Doc. no. 14.) Defendants cannot reasonably contend they were unaware of the Order or its terms, nor can Defendants argue they could not comply with the TRO. As explained herein, Defendants have violated the letter and the spirit of the TRO by competing directly against Plaintiffs. Accordingly, Plaintiffs have demonstrated the propriety of contempt sanctions.

That said, Plaintiffs recognize that Defendants may be entitled to a show cause hearing before sanctions for contempt can be entered. See, e.g., Watkins, 943 F.2d at 1304 (11th Cir. 1991) (suggesting hearing should be conducted before a party is held in contempt). As explained *supra*, Defendants' post-TRO conduct is also the subject of ongoing investigation and discovery. Accordingly, Plaintiffs move herewith for the Court to issue a Show Cause Order and to conduct a hearing in order to establish the relevant facts and determine what contempt sanctions are appropriate. And if the court determines that plaintiffs should be held in contempt, Plaintiffs request the opportunity to brief the Court on what sanctions the Plaintiffs believe would be appropriate.

WHEREFORE, Plaintiffs respectfully request the Court: (i) to order Defendants to show

cause why they should not be sanctioned and held in civil contempt, and (ii) to schedule a show cause hearing.

      Respectfully submitted, this 22nd day of January, 2024.

*/s/ Samuel J. Adams*
SAMUEL J. ADAMS
Georgia Bar No. 397520
JOHN E. PRICE
Georgia Bar No. 142012
DAVID HYMEL
Georgia Bar No. 798669
FULCHER HAGLER LLP
Post Office Box 1477
Augusta, GA 30903-1477
(706) 724-0171
sadams@fulcherlaw.com
jprice@fulcherlaw.com
dhymel@fulcherlaw.com
*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

This is to certify that I have on this day served all counsel of record in this case in accordance with the notice of electronic filing ("NEF") which was generated as a result of electronic filing in this Court:

Charles A. George
4000 Faber Place Drive, Suite 300
North Charleston, SC  29405
charles@george-law.com
*Counsel for Michael Thomas, Ashley Thomas,*
*Wesley Roberts, and Next Marketing Group, Inc.*

This is to further certify that I have on this day served the foregoing by United States Mail, postage prepaid, addressed to the following:

Kathleen Sanders
268 Foxfire Court
Martinez, GA  30907
*Defendant*

This 22nd day of January, 2024.

/s/ *Samuel J. Adams*
SAMUEL J. ADAMS
Georgia Bar No. 397520
JOHN E. PRICE
Georgia Bar No. 142012
DAVID HYMEL
Georgia Bar No. 798669
FULCHER HAGLER LLP
Post Office Box 1477
Augusta, GA 30903-1477
(706) 724-0171
sadams@fulcherlaw.com
jprice@fulcherlaw.com
dhymel@fulcherlaw.com
*Attorneys for Plaintiffs*